courts, and that as thus amended said decree be reinstated and affirmed.

BREAUX, C. J. I dissent and adhere to the original opinion adopted unanimously by the court.

─────────

(61 South. 860.)

Nos. 18,813, 19,777.

Succession of WHITE.

(May 22, 1911. On Continuance, Feb. 12, 1912. On the Merits, March 31, 1913. Rehearing Denied May 12, 1913.)

*(Syllabus by the Court.)*

On Motion to Dismiss.

1. APPEAL AND ERROR (§ 801*)—DISMISSAL—INSUFFICIENT RECORD.

Where original letters which have been offered in evidence cannot be found, the court will not act on a motion to dismiss the appeal until it has considered the evidence, as it may be that the case can be decided without the missing documents.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 3161–3164; Dec. Dig. § 801.*]

On the Merits.

2. WILLS (§ 289*) — OLOGRAPHIC WILLS — BURDEN OF PROOF.

Where the probate of a purported olographic will is opposed by the heir at law on the ground of forgery, the burden of proof is on the proponents to establish the validity of the instrument by a preponderance of the evidence, and where circumstances of grave suspicion surround the confection and production of the instrument, the preponderance of such evidence should be clear and decisive.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 653–661; Dec. Dig. § 289.*]

3. WILLS (§ 302*)—OLOGRAPHIC WILLS—EVIDENCE.

Proof of the execution of a testament by comparison of handwriting is an inferior kind of evidence, and not sufficient per se to prove the validity of an olographic will, except in cases where no other kind of evidence is obtainable. The Civil Code, art. 1655, as amended, requires such a will to be proved by the testimony of witnesses who are familiar with the handwriting of the deceased, and who "recognize the testament as being entirely written, dated and signed in the testator's handwriting."

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 575, 581, 700–710; Dec. Dig. § 302.*]

4. EVIDENCE (§ 574*)—OPINION EVIDENCE—OLOGRAPHIC WILLS—FORGERY.

Where the evidence of witnesses of that kind clearly preponderates against the validity of a purported olographic will, and the circumstances attending the confection and production of the instrument are very suspicious, the conflicting opinions of experts will be disregarded, and the testament will be declared a forgery, especially where the evidence shows that the instrument is an amplification of a prior forged will produced by the same proponents.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. § 2400; Dec. Dig. § 574;* Wills, Cent. Dig. § 159.]

Appeal from the Civil District Court, Parish of Orleans; (18,813) W. B. Sommerville, Judge; (19,777) Porter Parker, Judge.

In the matter of the Succession of Lydia Burnett White. From a judgment admitting the will to probate, James F. Burnett appeals. From a judgment declaring a document presented not to be the olographic testament of deceased, all the proponents appeal. Cases consolidated. Judgment in the last case mentioned affirmed, and judgment in the first case reversed and proceedings dismissed.

Arthur J. Peters, of New Orleans, James Wilkinson, of Point La Hache, and B. B. Howard, of New Orleans, for appellants in 18,813 and appellees in 19,777. Claude L. Johnson and E. M. Hudson, both of New Orleans, for appellee in 18,813, and for appellant in 19,777.

On Appellee's Motion to Dismiss.

BREAUX, C. J. The grounds of this motion are: The record is incomplete, and that for that reason the appeal should be dismissed.

The certificate of the clerk of the district court shows that the transcript is not complete.

We are informed by the mover's statement, forming part of his motion, that 21 documents were offered in evidence by appellants on the trial of the cause, and that these documents, together with others, some six in number, offered in evidence by appellee, were to be sent up as originals forming part of the transcript.

The statement is that three letters written by the late Mrs. White are missing; that they are indispensable for comparison with her latest handwriting, and that they are besides impeaching evidence, as they impeach the testimony of the chief beneficiary of the will; that these papers and letters were considered by the judge a quo in pronouncing judgment; that they have disappeared since the date of the judgment in the district court.

The clerk of court in certifying to the date of the transcript declared that, in accordance with the instructions of counsel of the respective parties, given on March 11th of the present year, he copied all the papers and documents necessary to complete the transcript except the lost documents; that he was unable to find these lost documents after a most careful and diligent search.

The appellee asks for a nonconditional dismissal of the appeal.

On Appellants' Motion to Remand and Consolidate.

[1] They represent that, if in the present state of the record of appeal the cause be taken up for hearing and decision, it will not be possible for the court to arrive at a satisfactory conclusion. They also aver that the missing documents are very much needed. They further aver that "on the thirtieth day of March, 1911, a second and a later will of the deceased, Mrs. White, was found"; that it is filed by proponent in the district court for probate; that in this last will the testatrix refers to the first will; and that in consequence it proves, as movers state, the genuineness of the first will.

They further aver that justice demands the remanding of the case to be cumulated and merged with the proceedings to probate the will of more recent date.

Both motions are premature.

They are referred to the merits.

After the case will have been submitted for decision, and the evidence will have been considered, it will be in order to determine whether the appeal should be dismissed, or remanded, or the case decided as now made up.

It may be that, after argument and consideration of the evidence, it will be possible to decide the issues without applying the contents of the missing papers.

We are informed that the clerk has not given up all hope of finding the missing papers; if he finds them, they will be produced.

There is no suggestion before us regarding the negligence or fault of any one in matter of the papers before referred to.

Altogether, we are of opinion that it is better not to act in the premises at present.

For reasons stated, the motion will be hereafter considered and disposed of as required.

SOMMERVILLE, J., takes no part herein.

## On Continuance of No. 18,813.

PER CURIAM. Considering that this is a contest over the genuineness of a purported olographic will of the deceased, and that a later purported olographic will of the deceased has been presented for probate in the court below, and further considering that 28 original documents in the handwriting of the deceased are missing from the record, it is ordered that the submission of this cause be set aside, and that it be continued until the further orders of this court.

MONROE, J., dissents.

## On the Merits.

LAND, J. Mrs. Lydia Burnett White, for many years a resident of the city of New Orleans, died at Biloxi, Miss., on June 28, 1910, where she had gone eight days before to spend the summer. She was buried in New Orleans on July 1, 1910. Mrs. White's succession was opened on July 5, 1910, by James E. Schenk, alleging under oath that he had reason to believe that the decedent had left a last will, and that it was deposited in her bank box in the Whitney-Central Bank. A few hours later James F. Burnett, the brother and sole heir of the deceased, appeared and filed a petition alleging his belief that his sister, Mrs. White, had died intestate, but joining in the prayer for the production of said bank box. When the box was produced in court and opened, no will was found. The notary appointed to make an inventory of the succession property, on July 8, 1910, found in a wardrobe, in the residence of Mrs. White in the city of New Orleans, between the pages of a book, a sealed envelope, on which was the superscription:

"Last will of Lydia White."

The envelope when opened by the judge, disclosed a document purporting to be the will of the deceased, reading as follows, to wit:

"Know ye all men that I, Lydia White make this my last will being of sound mind and understanding.

"No. 1. I give to my dear friends Mr. and Mrs. S. Hernandez my house No. 1736 Fourth St., now occupied by them, and all it contains belonging to me, with the exception of a few things hereafter mentioned.

"No. 2. To my dear friend Abagail Shenk of Louisville, Ky., I give my diamond brooch, watch and trunk which I take with me to Biloxi, also the sum of two hundred dollars.

"No. 3. To my dearly beloved friend, Irene Hester I give all my bonds.

"No. 4. To Miss Mamie O'Harra for many kind attentions I give my diamond ring, the one I wear.

"No. 5. I desire that my god child Lydia Black will receive my much prized piano and one hundred dollars.

"No. 6. My locket with my parents portraits I give to my cousin Annie Miller as a keepsake.

"No. 7. To Mr. Ed. Shenk I give my property at Henderson Point, Miss.

"No. 8. To Eloise Walker Duffy I give my silver caster, as a remembrance of me.

"No. 9. To little Stella Hernandez whom I dearly love I give three hundred dollars.

"No. 10. To Mrs. Octavie Lopez Toomey my silver service as a mark of esteem for her kindness to me.

"No. 11. I also give to Mrs. S. Hernandez my diamond ear-rings which I hope she will always wear in remembrance of me. I give them as a special mark of affection for her kind treatment in tending to my person during all my illness.

"No. 12. The rest of my property and effects I wish my brother J. F. Burnett to have.

"After all bequests are paid also debts I desire the remainder of money in bank divied (divided) into three equal parts, one part for my brother, one for Irene Hester, and one for Mrs. Hernandez.

"Written and signed by my own hand on the sixteenth day of June, Nineteen Hundred and Ten. June 16th, 1910.

"Lydia White née Burnett."

On July 21, 1910, Mr. and Mrs. Hernandez and other legatees named in the purported testament propounded this writing as the last will of Mrs. Lydia White, née Burnett, in olographic form. J. F. Burnett, as next of kin, opposed the probate of the document on the ground that it was a forgery. After a lengthy trial, Judge Sommerville rendered judgment in favor of the opponent, declaring the document presented not to be the olographic testament of the deceased, and refusing to admit it to probate. From this judgment all the proponents, except the two Schenks, appealed to this court, and the cause was in due course argued and submitted. While the cause was under advisement, the court, being informed that the same proponents had produced and propounded in the lower court another document, of date June 18, 1910, purporting to be the last will of Mrs. Lydia White in olographic form, set aside the submission and reinstated the case on the trial docket, to await the further order of the court.

J. F. Burnett opposed the probate of the second purported will, on the ground that it was a forgery. The issue thus tendered was tried, and Judge Parker decided that the second alleged will of date June 18, 1910, was the genuine olographic will of Mrs. Lydia White, deceased. From that judgment, J. F. Burnett has appealed suspensively to this court.

The last purported will reads as follows, to wit:

"New Orleans, La., June 18, 1910.

"Know ye all men by these presents, that I Lydia White being of sound mind do make this my last will and testament.

"I cancel the one I made on the sixteenth of June and put in the bank.

"I was feeling very ill and disappointed and consequently I was very irritable and did not declare my real intention.

"I wish to make the following disposition of my possessions:

"No 1 My house No 1736 Fourth Street and all that it contains except my Piano I give to Mr and Mrs. Salvador Hernandez as a mark of my esteem and appreciation for all their kind attentions to me.

"No 2 To Mrs Salvador Hernandez I give all my silver except my castor, and the sum of Two thousand dollars for services rendered and her great kindness and gentleness in tending my person during all of my illness.

"No 3 To my dear friend Irene Hester I give all my Bonds and my Diamond ear rings as I had always promised them to her.

"No 4 To my life long friend Jennie Hester I give the sum of One thousand dollars as a loving remembrance.

"No 5 To dear Abby Schenk I give my trunk which I am taking with me to Biloxi my diamond brooch and the sum of Four hundred dollars.

"No 6 To Alice Walker whom I have known since childhood I give the sum of One thousand dollars.

"No 7 To Mrs Eloise Walker Duffy I give my silver castor and Two hundred dollars.

"No 8 To Miss Mamie O'Harra I give my cluster diamond ring and Fifty dollars (to replace the center stone) as a remembrance of her many kind attentions.

"No 9 To little Stella Hernandez whom I dearly love I give the sum of Three hundred dollars.

"No 10 To Ed Schenk I give my property at Henderson Point, Miss.

"No 11 To Mrs Octavie Lopez Toomey I give the sum of Three hundred dollars for her many kind services and attentions to me.

"No 12 To my old friend Nellie Stevens I give Five hundred dollars.

"No 13 To my God child Lydia Black I

give my much prized piano the companion of my youth and the sum of One hundred dollars.

"No 14 I give One Hundred dollars to the 'Daughters of the Confederacy.'

"No 15 My watch and chain I give to little Corinne Hernandez, for her kind disposition in running my errands.

"No 16 My Topaz pin I wish Miss Christina Ball to have as a token of esteem, she was a good and faithful daughter to Julia.

"No 17 To my cousin Mrs. Annie Miller I give my locket with my parent's portraits as a Keepsake.

"No 18 To Mrs. Caroline Brewster I give the lot at the Naval Station Algiers that once belonged to her and the sum of One hundred dollars.

"No 19 To Mrs Sarah Javelet I give my Diamond and Ruby ring as a souvenir.

"No 20 To my friend Fannie Rager of Philpot Ky I give my set of small beauty pins.

"No 21 I desire the double cottage No. 1726–1728 Fourth Street and the lot No. 2718 Baronne St. sold and the proceeds to pay all legacies and expenses.

"No 22 The remainder of my estate I give to my Brother James F. Burnett.

"I have made this will as a precaution against a sudden death. I have been quite ill for some time past and I feel very badly at times.

"I request Mr Hiddleston Kenner and Mr Albert Duffy to act with Mr Salvador Hernandez as administrators of my estate.

"Written dated and signed by me on this the Eighteenth of June Nineteen hundred and ten.                    Lydia White née Burnett.

"(June 18, 1910) 8 P. M."

This will is superscribed as follows:

"My last Will and Testament.
                    "Lydia White."

The case was regularly fixed and after a trial lasting several months the trial judge maintained the will in the following "Judgment":

"This is a suit to probate a will, which is opposed on the ground that the document is a forgery. There is a clause in the present will revoking a will of June 16, 1910, and this will bears date of June 18, 1910.

"The will of June 16, 1910, was held to be a forgery by my predecessor (Mr. Justice Sommerville), and it is perfectly patent and admitted that the two wills are not in the same handwriting.

"This discrepancy could be accounted for on the theory that the purported will of June 16, 1910, now on appeal, was used by the testatrix as a form of a will, which she subsequently

132 La.—29

destroyed. The testatrix had no relatives, other than a brother she had not seen for 17 years.

"The bequests as made are all readily accounted for, as all of the beneficiaries had been most kind to her during life. A very significant feature is that a Mrs. Rager, of Philpot, Ky., was unknown to the other beneficiaries, and her identity only disclosed by the testimony of testatrix's brother, who had not seen his sister for 17 years.

"The experts for the proponents were all positive as to the genuineness of the will, and the paying teller of the bank wherein testatrix kept her account testified he would have cashed any check bearing the signature attached to the will. A careful examination of the will shows that there has been no retracing, and it would seem impossible to forge a will of four pages of legal cap paper without retracing some of the words.

"If this document be a forgery, it is a work of art.

"The proof absolutely satisfies me that the will is genuine. The only part to cast any doubt on it is the reference to the will of June 16th.

"Let there be judgment as prayed for, ordering the probate of the will.

"New Orleans, December 2, 1912.
          "[Signed] Porter Parker, Judge."

For the sake of brevity, we will call the document of date June 16, 1910, the "first will," and the document of date June 18, 1910, the "second will."

The "first will" was found by the appraisers on July 9, 1910, in a book in an armoir in the room of the deceased, and was indorsed in a sealed envelope, on which was superinscribed the words:

"The will of Lydia White."

This document was presented to the district court as the last will and testament of Mrs. Lydia White, and the proponents and their witnesses swore that the document was in the handwriting of Mrs. White. Judge Sommerville, after considering the evidence pro and con, held that the "first will" was a forgery. Judge Parker came to the same conclusion, saying:

"It is perfectly patent and admitted that the two wills are not in the same handwriting."

Proponents now argue that the "first will" was a form prepared by some unknown

friend of Mrs. White, and which she used in making a will, which has disappeared.

[2] The contention that Mrs. White made a will on June 16, 1910 which she destroyed on or before June 18, 1910, and the further contention that the "first will" was a mere form for the guidance of Mrs. White in drafting her testament, is not supported by a tittle of evidence. The superscription on the envelope containing the "first will" shows that the inclosed document was intended to serve the purposes of a testament. Proponents alleged and swore that the document was a will, written by Mrs. Lydia White, and the opponent averred that the purported will was a forgery pure and simple. On this issue of forgery vel non the case was tried in the court below, and was argued and submitted in this court. Proponents are concluded from shifting their position for the purpose of bolstering up the "second will." The judgment by Judge Sommerville that the "first will" was a forgery must be affirmed.

The first and second wills were found in the same room. The first was readily discovered, as it protruded from the pages of a book in the armoir of the deceased. The second was hidden beneath the linings of a dictionary, which were securely sealed. According to the testimony of Mrs. Hernandez, the existence of the second will was discovered by an accidental dropping of the dictionary by one of her children, which burst the covering and revealed the document. It is not at all probable that Mrs. White would have concealed her last will in such a manner as to render its discovery a matter of chance. The "last will" did not appear until after the "first will" had been declared a forgery, and there is no extrinsic evidence tending to show its existence at the date of Mrs. White's death.

All of these suspicious circumstances must be considered in determining the validity of the "second will." The second paragraph of this instrument reads as follows:

"I cancel the one I made on the sixteenth of June and put in the bank."

As Mrs. White did not deposit any will in the bank where she kept her valuables in her bank box, the foregoing statement is false, and its falsity tends to prove that the instrument was not written by Mrs. White. Item 18 of the "second will" reads as follows:

"To Mrs. Caroline Brewster I give the lot at the Naval Station, Algiers, that once belonged to her and the sum of one hundred dollars."

Mrs. Brewster's Christian name was Catherine and not Caroline. Mrs. Brewster testified in part as follows:

"I boarded at Mrs. White's for years, and we were very intimate, and she knew that my name was Kate just as well as she knew that her own name was Lydia, and as well as I knew that her name was Lydia."

The proponents argue that the statement that the will had been "put in bank," and the designation of Mrs. Brewster by the name of "Caroline," instead of Catherine, were "mistakes" of the testator due to lapses of memory. It is more reasonable to presume that said mistakes were due to ignorance on the part of the author of the will.

A number of ladies, intimate friends of Mrs. White for years, and well acquainted with her handwriting, testified that the "first will" was a forgery. Among them was a very intelligent lady, a school-teacher by vocation, to whom was bequeathed all the "Bonds" of the testatrix. In the "second will" the same bequest was made, with the addition of diamond earrings which the testatrix had always promised to her. This legatee testified that the "second will" was also a forgery.

The ladies who testified that the "first will" was a forgery also testified that the "second will" was not in the handwriting

of Mrs. White. Nearly all of proponent's witnesses who testified that the first will was genuine also testified that the second will was written, dated, and signed by Mrs. White. As the latter were mistaken as to the genuineness of the "first will," it is evident that their testimony as to the "second will" is entitled to but little consideration. The lay evidence, given by witnesses who were best acquainted with Mrs. White and her handwriting, preponderates in favor of the proposition that the "second will" is a forgery. As to the expert evidence, we do not consider paying tellers of banks as experts in handwriting. Such officials, doubtless, have a certain skill in the comparison of signatures on bank paper, but cannot be considered as experts in chirography. The expert of the proponents and the expert of the opponent differ in their conclusions as to the genuineness of the "second will." In cases of this kind the work of an expert is of assistance to the court in pointing out differences and discrepancies in handwriting, which afford the judge a basis for forming his own opinion of the genuineness of the handwriting in question. Minor variations in the handwriting of the same person at different times may be expected. On the other hand, close imitations of handwriting may be expected in every artistic case of forgery. The recent Maloney Cases before this court have demonstrated that signatures may be forged with such skill as to practically defy detection. In all such cases the question of forgery vel non must be determined in a large degree on intrinsic and extrinsic facts and circumstances. We have already noted two false statements of facts in the "second will," and it is evident that it is but an amplification of the forged will of June 16, 1910. Both contain bequests in the same language, as for example:

"To little Stella Hernandez whom I dearly love I give three hundred dollars."

The connection between the two purported wills is so evident that counsel for proponents argue that the "first will" was used as a form for the "second will." The "first will" was forged, and the natural inference is that the same or some other forger used it in drafting the "second will." Forgery is further indicated by very remarkable changes in the bequests of the purported testatrix within the brief period of 48 hours. Changes without reason or cause; as the diminution of the legacy to her brother by $5,400 and more, by the increase of the legacies to the Hernandez family by $2,500 and more, and by the addition of ten special legacies, some of which Mrs. White had spoken of to her friend shortly before her death, as shown by the testimony adduced on the trial of the probate of the first will.

We think that all of those criminatory facts and circumstances render it unnecessary for us to discuss at any great length the opinions of the lay and expert witnesses adduced on the probate of the last will.

[3] Six ladies, intimate friends of Mrs. Lydia White, for many years, and who had frequently seen her write and sign her name, and some of whom were beneficiaries under both purported wills, testified most positively that the "second will" was not in the handwriting of Mrs. White. The same witnesses had previously testified that the "first will" was a forgery. The testimony of said witnesses is of the highest probative value, because it rests on knowledge derived from having often seen the deceased write and sign her name. Article 1655 of the Civil Code provides that an olographic testament "must be acknowledged and proved by the declaration of two credible persons who must attest that they recognize the testament as being entirely written, dated and signed in the testator's handwriting" and *as having often seen him write and sign during his lifetime.*

To meet exceptional cases where such proof cannot be secured, the Legislature, by Act No. 119 of 1896, p. 168, substituted for the above clause which we have italicised a provision as follows, to wit:

"The judge shall interrogate the witnesses under oath touching their knowledge of the testator's handwriting and signature and shall satisfy himself that they are familiar therewith, making mention of the whole in his procès verbal thereof."

. The Civil Code provides nowhere for the proof of olographic testaments by comparisons of handwriting. In Succession of Roth, 31 La. Ann. 320, it was held by a divided court that testimony of experts, who had examined and compared the handwritings of the purported testator, was held to be admissible for the purposes of corroboration. The court said:

"We think that the testimony was admissible, as supplementing the proof already adduced of two persons who had derived their knowledge of the handwriting in the manner and from the source indicated by the Code, and in rebuttal of the testimony of the opponent, impugning the authenticity of the will, as being forged. Such testimony cannot by itself prove an olographic will, but when the handwriting has been established in the mode prescribed by the Code, and an opponent controverts the facts thus established by an allegation of forgery or other want of authenticity, the declaration of the two witnesses as to the handwriting may be supported by any other mode of proof, but otherwise, it is inadmissible."

This decision shows the inferiority of expert testimony, and restricts its probative force to *corroboration* of the testimony of witnesses, who have a *knowledge* of the testator's handwriting. Article 325 of the Code of Practice, reads as follows:

"If the defendant deny his signature in his answer, or contend that the same has been *counterfeited*, the plaintiff must prove the genuineness of such signature, either by witnesses who have seen the defendant sign the act, or who declare that they know it to be his signature, because they have frequently seen him write and sign his name."

"But the proof by witnesses shall not exclude the proof by experts or by a comparison of writing, as established by the Civil Code."

The Civil Code, however, does not provide for proof by experts or by comparison. But it has become the practice to admit such proofs in all cases in which issues of forgery vel non of written instruments are raised.

[4] Three bank employés were called as experts on behalf of the proponents who, after a brief examination and comparison of some of the handwritings of Mrs. White, in open court pronounced the "second will" to be genuine. These witnesses doubtless had experience in comparison of signatures on bank paper, but certainly were not experts in chirography. If they had been experts they would not have ventured to form and express positive opinions after such cursory examinations and comparisons.

The real experts in the case were Messrs. Spencer and O'Sullivan, the former employed by the proponents, and the latter by the defendant heir at law. Mr. Spencer found not a single difference between the handwriting of Mrs. White and the handwriting of the "second will," and stated, in substance, that the identity of the writings was so apparent that the services of an expert were not needed.

On the other hand, Mr. O'Sullivan pointed out a number of differences in the form and structure of letters and general characteristics of penmanship, leading to the conclusion that the "second will" was a forgery. Our independent comparison before reading the evidence disclosed a radical difference between the capital letter H as written by Mrs. White and the same letter as it appears several times in the "second will." Mrs. White joined the two side lines of her H's by a loop, commencing at the bottom of the second line. In the "second will" the two side lines of the same letter are joined by a horizontal line. Mr. O'Sullivan testified:

"The capital 'H's' are entirely and absolutely different from the capital 'H's' in the originals, not formed at all in the same manner."

We find no answer in the record to this specific statement, and to other statements of Mr. O'Sullivan pointing out differences of handwriting. Mr. O'Sullivan frankly acknowledged a few errors of comparison, due to the fact that he had not examined all the writings of Mrs. White produced on the trial of the cause. It appears that Mrs. White crossed her "t's" in three different ways, only one of which appeared in the letters examined by Mr. O'Sullivan. This incident shows the uncertainty of proof by comparison, even when made by recognized experts. Where the two best experts in the community differ so radically as to the genuineness of the "second will," nothing is left to guide the court except the evidence of lay witnesses and the facts and circumstances of the case.

We are of opinion that the evidence as a whole decidedly preponderates against the genuineness of the purported will, of date June 18, 1910.

It is therefore ordered that the judgment rendered by W. B. Sommerville, Judge, on February 14, 1911, and signed by him on February 20, 1911, be affirmed, and that the appellants pay the costs of this appeal.

It is further ordered that the judgment below rendered by Porter Parker, Judge, on December 2, 1912, and by him signed on December 10, 1912, and the judgment signed by the same judge on December 4, 1912, be annulled, avoided and reversed; and it is now ordered that all the demands of the proponents of the purported will, bearing date June 18, 1910, be rejected, and all the proceedings instituted by the proponents in the court below be dismissed with costs, and that the appellees pay the costs of this appeal.

SOMMERVILLE, J., takes no part.