NO. 8742

COURT OF APPEAL

PARISH OF ORLEANS.

———————

P. J. Leeman

versus

Silas Putnam.

———————

Dinkelspiel; J.

This suit is based on the following contract:

"I hereby offer and agree to purchase through you, P. J. Leaman, for the price of $7000.00 (then follows a **direx axt** description of the **xp** property) $1200.00 cash, taxes for the year 1922 to be prorated; if this offer is accepted I will deposit with you immediately in cash ten per cent of the amount thereof on account of the purchase price, not interest bearing; this deposit not to be considered as earnest money, the parties hereto agreeing to the right to demand specific performance, should they fail to comply with the terms or condititions of this offer if same is accepted, I obligate myself to pay on demand your commission on this sale and any attorney's fees and costs of Court that you may incur in enforcing collection of your claim; this offer remains binding until purchaser's signature.

(Signed) S. Putnam.

And beneath this document which was dated New Orleans, La., April 11th, 1922, we find the following:

P. J. Leaman, Agent. I accept the above offer, also terms and conditions and agree to pay you for services rendered, $210.00 same being earned and payable when agreement to purchase is signed and the offer is accepted.

The defendant admits **ix** his signature to the contract in question, denies any indebtedness to plaintiff whatsoever, alleges the offer in question was **dxaxixadxxxdx** declined and was further denies all the allegations of plaintiff's petition, except that he admits he refused to make any further offer for said purchase after the offer which he had made was declined and particularly denies that there was any contractual obligation on his part to accept title to said property after said offer had been declined, admits the offer which he had signed before same was

37

declined and called off by him, it provided for the payment of commissions as set out in said article, which however was not binding on respondent after said offer was declined, and withdrawn; admits that the offer which he made for the sum as set forth in said article, and the commission would have been due as set forth in said article, had said offer been accepted before same was withdrawn by him, but having been withdrawn, the contract sued upon was set aside and was null, void and of no effect and not binding upon respondent. Wherefore he prays that plaintiff's suit be dismissed.

On these issues the parties went to trial.

Plaintiff testifies that he secured the signatures on the document and identifies both, and the signatures were obtained on the day, April 11th, 1922, for the sum of $7000.00, and that his commission was three per cent; he further testifies that defendant did not accept the title.

Q. What time did you go to see Mr. Putnam? A. I phoned his wife that day telling her that the offer had been accepted.

Q. You are positive you told her that? A. Yes sir.

Q. You did not tell her the offer would be accepted provided an additional amount would be paid? A. No sir.

Q. You didn't tell her you had both good and bad news for her? A. No sir.

Q. Go ahead? A. That night I went to Mr. Putnam to get the ten per cent deposit; when I got up there he raised an objection that he did not want the property; his contention was the rooms were too small, the ceilings were too low.

Q. Did you not tell this defendant that his offer would be accepted provided he paid an additional amount? A. No sir.

Q. And didn't you tell him that the additional amount would also cover your commission? A. No sir.

Q. (By the Court). And did he not tell you "not only I will not

38

pay an additional amount, but I will withdraw my offer? A.
There was no discussion about any sum at all, except that he
refused to take the property on account of the property having
a low ceiling.

Q. Mr. Leaman, Answer my question, yes or no. Did he not tell
you, after you made him a counter proposition, that not only he
would not give the additional amount, but that the contract was
off? A. I don't remember anything like that.

Q. Did you have the contract with you when you went there and
show it to him? A. Yes sir.

Q. You mean signed? A. Yes sir.

Q. Did you not tell him that you would go back and see if the
vendor would come down to the seven thousand dollars, and he
told you it was off it was no use? A. No sir, I don't remember
any conversation of that kind, along those lines.

Q. Did you not say to him that under the circumstances you would
lose your commission if necessary, in order to make the sale?
A. No sir.

Q. And you did all you could to get him to consent to give the
additional amount or you would lose your commission? A. No sir:

Q. You didn't speak of that at all to him? A. No sir.

Q. You didn't tell his wife that you had good and bad news over
the phone? A. No sir.

Q. And you told her the good news was that this party would sell,
but he wanted something additional, and that was the bad part? Ax
A. No sir.

Q. What did you tell her? A. That the offer had been accepted and
I had no recourse whatever.

Q. Were you the agent for the vendor? A. Yes sir.

Q. I understand, Mr. Leaman, that there was not a word said about
any additional price, you simply went to Mr. Putham and told him
his offer was accepted? A. Yes sir; the purpose of my going there
was to get the ten per cent deposit.

39

Q. And thats all you told his wife? A. Yes sir, over the telephone.

The witness Leaman, being recalled to the stand, testified that the night in question he went to his office about 9:15 and found his stenographer there together with another employee, and that he addressed the letters in this record and mailed the letter the same night, he addressed the letter to 5120 Coliseum Street, but Mr. Putnam's address was Constance Street. The letter a confirmation that the offer had been accepted.

Q. I notice in your letter of April 12th, you don't mention writing him a letter of April 11; did you notice that? A. I don't see why I should.

Q. You don't refer to it at all? A. Let me take a look at my letter of April 12 and I will tell you. (Reads the letter) No, there is no mention there.

Q. You had written that letter of April 11th, though, when you wrote this? A. My stenographer wrote both letters, I dictated them.

Fred Hesse, the next witness being shown the documents in question, purporting to be a contract between him and the defendant, relative to the property in question, and asked whether or not it was his signature on the contract, answers yes.

Q. Are you the owner of the property 3638 Roberts Street? A. Yes.

Q. This contract mentions the purchase price of $7000.00? Did you accept that offer? A. Yes sir.

Q. Have you ever rejected such offer? A. Mr. Leaman brought the offer and I signed it and accepted it for $7000.00.

Q. Had you ever rejected the offer? A. No sir.

Q. When did you accept the offer? A. On the day it is dated, at that time.

Q. What time of day was it? A. About eleven o'clock in the day.

Q. When was this contract first presented to you? A. Mr. Leaman rang me up and asked me if I would accept seven thousand dollars, that he could get this party to give it; he said "I will come up with a contract, will you sign it" and I said "yes"; that was over the telephone.

Q. What time was that? A. About nine o'clock in the morning.

Q. What time did you see him after that? A. About eleven o'clock when he came with the contract.

By the Court. Q. Is it not a fact that you signed this contract after Mr. Leaman came back to see you that night? A. No sir, I signed it when he came about eleven o'clock and he showed me the signature at this time, that it was accepted if I would accept seven thousand dollars, I said alright, and I signed it.

The letters annexed speak for themselves, and as they are not material, except as to the date, they need not be described in this opinion.

The first witness introduced in behalf of the defendant is his wife, and quoting only as much of her testimony as we consider necessary for a decision in this case, she testifies that it is her custom to answer telephone messages received for her husband, she says she answered the telephone call of Mr. Leaman on April 11th, and she spoke to him.

Q. What did he say to you? A. He asked me if Mr. Putmam was home and I told him yes; he said tell him I will be up there in a little while, I have got good and bad news for him.

Q. You are positive of that? A. Yes sir.

The defendant himself testifies that he signed the contract in question, Mr. Leaman came to see him on April 11th, he came in the morning to look at the house, he came again about seven thirty or a quarter of eight.

Q. What did he say to you? A. He said, I have good and bad news for you, would you be willing to pay One Hundred Dollars more.

41

said no, the deal is off, he ten said I will have to lose a part of my commission and I will sell your property and get it back.

Q. What did you tell him? A. No sir, the deal is off.

Q. Did he tell you anything at that time that this contract was signed and show it to you? A. No sir.

Q. When did you hear it was signed? A. Three days afterwards, when I got a notice from him.

Q. Did he say anything to you about getting ten per cent deposit that evening? A. No sir.

Q. Who was there when you told him what you say here? A. My son, he was sitting between us on the front porch, he said when he was leaving think it over tonight and **Ix** let me know in the morning what you will do, I said possibly I will get up to see you in the morning; when I got down to my work in the morning I found I was not able to leave and phoned him, he says to me "are you going through with it" and I says "I told you last night it was off, and he said "you will have to pay me my commission", I said we will see about that.

Replying to the question whether or not this witness received a letter dated April 11th or not, and after the letter was read he says no sir I never received it, I gave all the letters that I received to my counsel, Mr. Livaudaisl. He goes on to testify that two or three days afterwards he received a letter dated on the 12th or 13th of April and does not know whether he received a letter dated the 11th of April.

Q. Did you Advise Mr. Leaman, when he wrote you on April 12th, the letter you admit having received? A. I advised him on the morning of April 12th, I told him the night before I was not going to carry it out.

Q. Then when you testified a while back that you did not know that this document was signed until three days afterwards you were mis-

taken in your former testimony? A. I have to withdraw that.

Q. The contract being rejected by Hesse you revoked your offer? A. When Mr. Leaman asked me if I would be willing to pay one hundred dollars more I told him no the contract was off, then he came back at me and says, Oh! I will have to lose part of my commission and I will sell your house and catch it back; naturally I understood the contract was rejected.

Q. Is it not a fact that you told your attorney Mr. Livaudais that Mr. Hesse had rejected the contract? A. I did not tell him that, no.

The next witness, G. J. Putnam, a son of defendant in this case, recalls the conversation between his father and plaintiff in reference to the purchase of the property in question; he was present and the conversation was on the front porch, he heard what both were talking about and this question was propounded in so far as plaintiff was concerned:

Q. What did he say? A. Thakx He said, Mr. Putnam, I have good and bad news for you, should you be willing to pay one hundred dollars more, my father told him he would not and called the deal off, he remained there for a little while and he said, I will have to lose part of my commission and I will sell your house and catch it back.

Q. What did your father say to him? A. He said, nothing doing; you axiixx can call the deal off.

Q. Did he say anything about the contract being signed by Mr. Hesse? A. Not a word.

Q. You are positive of that? A. Positive of that, he never mentioned contract at all.

The question for determination mainly involved in this litigation is whether or not a contract of the character in question can or not be revoked.

The Civil Code Art. 1800, reads:

The contract, consisting of a proposition and the consent to it, the Agreement is incomplete until the acceptance of the person to whom it is proposed, If he, who proposes, should before that consent is given, change his intention on the subject, the concurrence of the two wills is wanting, and there is no contract.

Art. 1801. The party proposing shall be presumed to continue in the intention, which his proposal expressed, if, on receiving the unqualified assent of him to whom the proposition is made, he do not signify the change of his intention.

Art. 1812. Express consent must be given in a language understood by the party who accepts, and the words by which it is conveyed must be in themselves unequivocal; if they may mean different things, they give rise to error, which, as is hereinafter provided, destroys the effect of a contract.

A proposition does not become an agreement until the party to whom it was made accepts it.

Cavelier vs. Germain 6 La. 215.

When one party submits a proposal for a contract to another, and the latter's acceptance of the proposal includes a material modification of the proposal, no contract will result until the modification has been acquiesced in by the party making the proposal.

Connell vs. Hill, 30 Ann. 251.

Where, after a person had made a written offer, he received no actual notice of an acceptance until after he had made a contract involving the subject matter with another the acceptance came too late to bind him, he having already signified his change of intention within Rev. Civ. Code, art. 1801, providing that a party proposing shall be presumed to continue in the intention which his proposal expressed, if, on receiving the unqualified assent of him to whom the proposal is made, he does not signify the/change of his intention.

Union Sawmill Co. vs. Mitchell, 122 La. 900.

44

The evidence in this case satisfies us that plaintiff phoned to the residence of the defendant inquiring for him, and that defendant's wife who usually answers the phone for her husband, after plaintiff had given his name, xxixxx was told by plaintiff that he wanted to speak to her husband to tell him that he had good and bad news for him. That shortly thereafter plaintiff went and called on defendant in person and in the presence of defendant's son said to him, "I have got good and bad news for xxxixxxixxxxxi you, there is one hundred dollars difference between the price that I am offered and that which you want, but I can xxxxxx arrange this by getting a purchaser for this place subsequently and you will get the benefit thereof", or words to that effect, to which proposition defendant replied, "nothing doing, the deal is off" and notwithstanding plaintiff's efforts, stating what he could and could not do, defendant insisted that the deal was off. Added to this is the testimony of defendant's son which confirms this conversation and denies as stated in the testimony given by the plaintiff in this case denying any such conversation and testifying that he, plaintiff went to his office that night about nine o'clock and there found his stenographer and made an immediate demand on the defendant stating that his proposition had been accepted. This testimony, with the xxx affirmative statement of defendant, his wife and son xxxxx is true and the testimony given by the defendant and other parties heretofore mentioned is correct that defendant refused to consent to the proposition but absolutely and unqualifiedly called the sale off. The letters written by plaintiff were for his own benefit and in our opinion an afterthought in order to hold defendant for his commission.

Plaintiff in our opinion his utterly failed to make his case certain and that is required by our law. It requires no citation of authorities to prove this fact.

For the reasons assigned, it is ordered, adjudged and decreed, that the judgment of the Court aquo in this case in favor of plaintiff is annulled, avoided and reversed and that there now be judgment in favor of defendant, dismissing his plaintiff's suit at his costs in both Courts.

-Judgment reversed and judgment rendered in favor of defendant-

I respectfully dissent, for
Written reasons this day
submitted

Feb'y 19, 1923

Wm. H. Bell
Judge

P. J. LEAMAN : NO. 8742

    VS      . :      COURT OF APPEAL

SILAS PUTNAM : PARISH OF ORLEANS

                           ; ; ;

APPEAL FROM THE FIRST CITY COURT FOR THE CITY OF
NEW ORLEANS, SEC. "C," HON. HY. RENSHAW.
JUDGE.

- - - -

DISSENTING OPINION OF WILLIAM A. BELL, JUDGE

- - - -

I respectfully dissent to the majority opinion rendered
this day by the Court in the above entitled matter, for the follow-
ing reasons:

This is a suit by a real estate agent for the recovery
of his commissions alleged to be due him under a contract signed by
the defendant, the material parts of which, for purposes of this
case, read as follows:

"I hereby offer and agree to purchase
through you, P. J. Leaman, for the sum and price of
$7,000.00, the following described property * * *

. . . .

"If this offer is accepted, I will de-
posit with you immediately in cash 10 per cent. of the
amount thereof on account of the purchase price, non
interest bearing, this deposit not to be considered as
earnest money, the parties hereby reserving the right
to demand specific performance.

. . . .

"Should I fail to comply with the terms
or conditions of this offer after same is accepted, I ob-
ligate myself to pay on demand your commissions on this
sale, and any attorneys fees and costs of court that you

47

may incur in enforcing collection of your claim. This offer remains binding and irrevocable until _____.

(Purchaser's signature)     (Signed) S. Putnam

Address _____.

New Orleans, La., 4-11-1922.

"P. J. Leaman, agent.
"I accept the above offer, also terms and conditions, and agree to pay you for services rendered $210.00, same being earned and payable when agreement to purchase is signed and offer is accepted.

(Signed) Fred Hesse."

Upon the above contract plaintiff sued defendant, who refused to comply with the conditions of offer to purchase and hence it is claimed that the $210.00 (3% of $7,000.00, the total purchase price) is due by the proposed purchaser unto the plaintiff herein. There is judgment in plaintiff's favor for the amount prayed for, with attorney's fees and interest.

I see no error in the judgment and believe it should be affirmed. A careful review of the evidence and of the pleadings discloses the fact that the defendant, in the early business hours of the morning of April 11, 1922, signed the above offer to purchase and that shortly thereafter, not later than 11 o'clock of the same day, the offer to purchase was accepted without any qualifications whatsoever. The testimony of both plaintiff and defendant verify these facts, but it is contended as a matter of defense and alleged in defendant's answer that the written offer was declined and after the declination the original offer to purchase was withdrawn by defendant. Further in his answer it is alleged as an admission that the offer which respondent had signed before same was declined and called off by respondent, did provide for the payment of commissions as set forth in the written contract, but that same was not binding on respondent after said offer was declined and withdrawn. It

48

is further alleged in defendant's answer that said commissions would have been due had defendant's offer to purchase been accepted before same was subsequently withdrawn, but that defendant's offer to purchase having been declined and subsequently withdrawn, that the contract sued upon was hence set aside and absolutely null and void. This defense is not borne out by the testimony, because of the facts just noted, to the truth of which both litigants have testified.

In direct examination plaintiff swears that he presented the written offer to purchase to the defendant early in the morning, that he signed same and that at 11 o'clock the vendor of the property accepted the said offer to purchase; that he, plaintiff, then phoned the wife of the defendant stating that the transaction had been closed and that the owner of the property had accepted defendant's offer to purchase; that he subsequently called at defendant's residence, about 8 o'clock that same day, to advise him in person of the accepted offer to purchase and to collect, if possible, the ten per cent. deposit agreed upon; that defendant thereupon refused to comply with the terms of the contract to purchase, giving as his reason therefor that the rooms of the house were too small and the ceilings too low; that he had with him the written contract of sale and exhibited same to the defendant, showing him that the owner of the property had also made written acceptance of the offer to purchase. There are two letters in the record which show that, within a reasonable time, defendant was called upon to comply with the terms of the contract and that his lawyer, in reply to these demands, wrote a letter giving as the only excuse for failure to comply with the contract the fact that defendant's offer to purchase had been rejected. The testimony of the owner of the prop-

49

erty is direct and positive that there was no qualification whatever of his acceptance of defendant's offer to purchase and that said acceptance was signed by him about 11 o'clock of the same day in which the offer to purchase was made, to-wit: April 11, 1922.

Notwithstanding these positive statements made by plaintiff and the owner of the property, the defendant took the stand and never at any time attempted to deny or refute the testimony given by the plaintiff to the effect that the reason for rejecting the property was that the rooms were too small and the ceilings too low. There is not a word from him in the record as to why his original offer to purchase was withdrawn, and the fact cannot be denied that his attempt to reject the offer to purchase was made subsequent to the written acceptance by the owner.

This brings us to the only controversy in the whole proceedings and involves the credibility or not of certain testimony given by the defendant, his wife and son. Their uniform story is that the plaintiff phoned defendant's wife during the day of April 11, 1922, and stated that he had "good and bad news," about the proposed sale of the property and that he would call at defendant's house at once to see him about the matter. The defendant and his son claim to have been present when plaintiff called, and both of them state that this remark was repeated to the defendant with the added statement "Would you be willing to pay $100.00 more for the property?" No other witnesses than those who are clearly interested witnesses are shown to have heard such a conversation and the plaintiff vigorously denies that he ever made such a statement either over the phone to the wife or subsequently to the defendant and his son, and follows up his vigorous

denial with the statement that he showed the written acceptance to the defendant and that defendant's only response to the information that the property had been sold was that he would not take it because the ceilings were too low and the rooms too small and that he was not getting a "good buy."

Nothing that has happened in the whole history of the transaction would justify the Appellate Court in believing these three interested and related witnesses when the trial court, who saw and heard all the witnesses, doubtlessly disregarded defendant's story or its attempted corroboration by his wife and son.

I am particularly unable to concur with the view of my colleagues in this matter because of what I believe to be the controlling law of the case, irrespective of the evidence. Even though plaintiff might have been guilty of an attempt to raise the price of the purchase for good or bad motives, it is evident that the offer to purchase was in such language as gave to the owner of the property the absolute power to accept and, by accepting to, bind the purchaser without further negotiations. There was nothing further necessary to bind the purchaser under the law applicable to the contract or offer to purchase, after the owner had signed the document above quoted.

Article 1802 Revised Civil Code reads:

"He is bound by his proposition, and the signification of his dissent will be of no avail, if the proposition be made under terms, which evince a design to give the other party the right of concluding the contract by his assent; and if that assent be given within such time as the situation of the parties and the nature of the contract shall prove that it was the intention of the proposer to allow."

The language of the Article just quoted is peculiarly applicable to the facts of this case and it was not necessary, in order that the purchaser or defendant in this case should be bound, that either Leaman, the agent for both parties, or the owner should have noti-

fied the defendant of the acceptance of defendant's offer to purchase. In other words, the contract, in which is involved an offer and an acceptance, was fully completed and the minds of the parties in relation to same had fully met at the moment of the acceptance by the owner of defendant's offer to purchase, that is, about noon of the same day, to-wit: April 11, 1922, in which the entire proceedings over which this suit has arisen occurred.

In the case of Union Saw Mill Co. v. Mitchell et al., 122 La., 900, the Court in discussing a case in which a contract to purchase certain timber lands had not been signed by the vendees or purchasers, clearly shows what ruling must be given under R. C. C. 1802, where the contract has been signed by all parties, particularly those who propose to purchase. In the latter case, as in the case now before us, if the proposition to purchase is made in such terms as show the intention of the purchaser to give the other party the right to bind the sale by assenting thereto, such assent is all that is necessary to conclude the transaction and bind those who are involved.

In my opinion, both the law and the evidence is conclusive that the owner of the property herein involved could absolutely bind the defendant in this case to purchase the property in question. This fact when applied to the law of the case makes the plaintiff's contract for commissions absolutely due and owing.

For these reasons, I respectfully dissent to the majority opinion herein rendered and believe that the judgment of the trial court, as appealed from, should be affirmed.

O. N. Bell
Judge