94 So.2d 420

Succession of Mary MORALES, Wife of Louis MUTIN.

No. 43028.

April 1, 1957.

Elmer D. Flanders, New Orleans, for appellant.

Siegfried B. Christensen, III, New Orleans, for appellees.

McCALEB, Justice.

Mary Morales Mutin, a Negro woman about 60 years old, died at her residence in the city of New Orleans on August 7, 1955. She had neither descendants nor ascendants, her nearest legal survivors being her husband, Louis Mutin, and her two sisters, Emily Cambre and Rose Williams.

On August 15, 1955, Mutin, alleging that his wife died intestate, caused her succession to be opened in the Civil District Court where an inventory of the succession property, which consisted entirely of community

assets, was taken and homolgated. The inventory disclosed that decedent's one-half share of the community amounted to $26,600.86, which her husband would have inherited under the provisions of Article 915 of the Civil Code in case she died intestate. However, before a judgment of possession was rendered in the succession proceedings, Richard J. Garvey, a practicing attorney in New Orleans, filed a petition therein, as executor of a purported olographic will of the decedent, and prayed that said will be admitted to probate. Mutin opposed the probate of this will, asserting that it was null for three reasons: (1) the uncertainty of its date; (2) the lack of testamentary capacity of decedent and (3) that it was a fraudulent instrument in that it was not entirely written, dated and signed by decedent. Following the filing of his opposition, Garvey was joined in his efforts to have the will admitted to probate by Rose Williams and Emily Cambre, the sisters of the decedent, who are named as universal legatees in the testament.

After a trial on the issues raised by the pleadings, the judge found for the proponents and admitted the will to probate. Mutin has appealed and he reurges in this Court the contentions for invalidity of the testament made below.

We first address our attention to the claim that the date on the will is uncertain. The testament was written on a plain piece of white paper and backed with heavy blue paper. It reads as follows:

"                                                         Feb 2/9/54

Mary Mutin My Last
Will
I geave every thing I
own to my tou-sisters
Enily Cambra and
Rose Williams
I make Richard Garvey
My Executor and my attorney
                                    Mary Morales Mutin."

In arguing that the date "Feb 2/9/54" is uncertain, counsel for opponent complains of the judge's action in permitting the proponents to adduce testimony (over his objection) in support of their position that the will was made on February 9, 1954 and that the abbreviation "Feb" was written on the date line after the will had been completed to signify that the numeral "2", contained in the date, represented the month in which the will was written.

We agree with counsel that it was error for the judge to allow the introduction of evidence to exhibit the intent of the testatrix as to the date of the will. Article 1588 of the Civil Code provides:

"The olographic testament is that which is written by the testator himself.

"In order to be valid, it must be entirely written, dated and signed by

the hand of the testator. It is subject to no other form, and may be made anywhere, even out of the State."

■ If an olographic will is undated or contains an uncertain date, its nullity results from a vice of *form.* Hence, it matters not whether the testator intended a particular date or not as extrinsic evidence cannot cure the defect. An uncertain date is the equivalent of no date at all and the sufficiency and certainty of the date must be determined from the face of the will. Heffner v. Heffner, 48 La. Ann. 1088, 20 So. 281; Succession of Robertson, 49 La.Ann. 868, 21 So. 586; Succession of Beird, 145 La. 756, 82 So. 881, 6 A.L.R. 1452; Succession of Curtis, 149 La. 487, 89 So. 629; Succession of Dyer, 155 La. 265, 99 So. 214; Succession of McCay, 166 La. 681, 117 So. 772; Succession of Kron, 172 La. 666, 135 So. 19; Succession of Wenling, 172 La. 673, 135 So. 21; Succession of Lasseigne, La.App., 181 So. 879 and Succession of Buck, 208 La. 556, 23 So.2d 215.

■ A different rule, however, applies when there has been an overcharge or surcharge of figures in the date of an olographic will. In such instances, evidence of handwriting experts may be received for the purpose of showing that the surcharged figures are visible and, if they permit the exact date to be seen and recognized with certainty, the will will be upheld. See Succession of Lefort, 139 La. 51, 71 So. 215 and Succession of McCay, supra. On the other hand, if, after a consideration of the evidence and an inspection of the surcharged figures, the Court finds that the exact date is not clearly visible, the testament must be rejected. Succession of Wenling, supra and Succession of Buck, supra and compare Succession of Reynolds, 224 La. 975, 71 So.2d 537.

Counsel for proponents, pointing to certain pronouncements contained in a per curiam refusing an application for a rehearing in Succession of Lefort, supra, which are to the effect that extrinsic evidence may be received in any case to throw light upon an obscure date in an olographic will and thus remove all doubt, uncertainty or ambiguity concerning it, insist that the testimony was properly admitted in the instant matter.

Counsel are mistaken. The cited observations from the Lefort case, which were pure obiter dicta as that case involved a surcharge, or superimposition of figures in the year date of the will, have been criticized and found to be incorrect in the later decisions of the Court,[1] although the ruling

1. In Succession of McCay, 166 La. 681, 117 So. 772, 773, the Court said: "While not agreeing with that part of the decision in Succession of Lefort that holds that extrinsic evidence may be resorted to in order to ascertain the intention

as to surcharges has been many times approved.

Since we hold that evidence was inadmissible to establish the date of the will intended by the testatrix, we proceed to a determination of whether the date, as written, is so uncertain that the testament must be held invalid for failure to comply with the form prescribed by law.

■ The will is dated "Feb 2/9/54". Obviously, the century and decade (1954) and the month of the year (February) are explicit. See Succession of Kron, supra and compare Succession of Beird, supra. Hence, if any ambiguity exists, it would appear to be in the day of the month and, as to this, the only question is whether the will is dated "Feb 2/1954" or "Feb 9/1954". We think it manifest that the date, as written, "Feb 2/9/54" cannot logically be resolved to be "Feb 2/54" as this would require that the figure "9" be disregarded. But this cannot be done as the figure "9", punctuated by virgules, is clearly intended to be part of the date. Thus, it is reasonably certain that "9" represents the day of the month on which the will was written, whereas the figure "2", which follows the abbreviation "Feb", was merely a repetition

by figure of the month, February, designated in the dateline and was undoubtedly intended to signify that month. In other words, the figure "2", following the abbreviation "Feb", and not separated therefrom by a punctuation mark, may be considered as though the testatrix had written "Feb" twice and then followed it with the punctuation marks "9/54".

Counsel for the opponent makes numerous contentions in his efforts to have us declare the date of the will as uncertain. Initially, he asserts that the figure "9", as written, could be a "4" because it is not closed at the top and that the "5" in "54" could be construed to be a "6".

We find no merit in these points for we think the figures "9" and "5", as written are legible and reasonably clear.

Counsel further contends that the virgule separating the figure "2" from "9" may be construed to be the figure "1" and, therefore, the date might be read "Feb 2, 1954" or "Feb 2 19/54", or that it could be read "Feb 29/54".

We find no substance in these postulations as the virgules used in the date are pronounced, thus making it patent that the date is not subject to such interpretation.

of the testator as to the date, we accept as correctly stated, and approve the French jurisprudence therein reviewed, in so far as the general law relative to surcharges is concerned." The quoted language from Succession of McCay was cited approvingly in Succession of Reyn-

olds, 224 La. 975, 71 So.2d 537. The observations in the Lefort case were also criticized in a per curiam refusing an application for a rehearing in Succession of Butterworth, 195 La. 115, 196 So. 39.

On the contrary, we consider the date, as written, to be reasonably certain and, therefore, the will is not amenable to the claim that it is invalid in form.

The second ground of attack is that decedent did not have the testamentary capacity to make a will. This, of course, presents purely a question of fact.

The record shows that decedent was about 58 years of age at the time of the writing of the purported will. She could read and write, that is to say, she was literate, though having only a second grade education. However, she had been suffering for many years from an acute diabetic condition and this, as the medical testimony shows, subsequently affected her vision. In 1952 the ravages of the disease resulted in her right leg becoming gangerous, necessitating its amputation below the knee. In addition, she suffered from cataracts on both eyes and an operation for the removal of the cataracts from one eye left her with limited vision out of her right eye. Extreme obesity and tremors of her hand also contributed to her generally infirm condition. But, despite her poor health and physical condition, decedent was able to accumulate over the years various pieces of real property and the rentals from this property, which she managed up until the time of her death, provided a comfortable livelihood for both herself and her husband.

The testimony relative to decedent's vision is highly contradictory, as is much of the evidence in this case. Two eye specialists, Dr. Jonas W. Rosenthal and Dr. Horace Dozier, testified that decedent could see at most one letter in a word at a time with a magnifying glass and that the operation for removal of the cataract from her right eye did little more than improve her sight from light perception to hand movement.

Dr. Dozier examined decedent two months after the purported will was written and his testimony was that she could do little more than read the headlines of a newspaper without glasses. And when she wore her glasses she could not see to read appreciably more. He stated that only with a magnifying glass was decedent able to read letters the size of one inch or less.

The testimony of the medical specialists is corroborated by the testimony of two lay witnesses who were in constant contact with decedent at the time the will was purportedly written. Her husband (opponent) testified she could not see sufficiently to prepare her insulin injection and either he or the maid prepared it for her. He said the magnifying glass which was bought for his wife did no good at all and she refused to bother with it, after the first futile attempt to see with it. He also said she never wrote anything except her signature

to endorse the rent checks and that she could not dial a telephone, look at television, tell the denominations of paper money, or read anything smaller than headlines on a newspaper.

When showed the purported will, opponent emphatically denied that it was in her handwriting, other than the signature. Yet he could produce no specimens of his wife's handwriting other than her signature. He did remember that, on March 11, 1943, both he and his wife had executed olographic wills in a lawyer's office, leaving the bulk of their estates to each other, but he could not find her will and he presumed she must have destroyed it.

Florence Richardson, who knew decedent for many years and who began working for her as a maid in 1952 and was employed until the latter part of 1954, corroborated much of opponent's testimony. Although Florence admitted she was illiterate, she said she knew decedent's signature and she never saw decedent write anything other than her signature.

On proponent's side of the case, ample evidence was adduced tending to prove that decedent could see well enough to write this will and that she did, on occasion, both read and write. Dr. Harry B. Caplan, the eye surgeon who removed the cataract from decedent's eye, testified the "operation was technically a success"; that with a lens she could read letters the size of 2 or 3 millimeters and that, after the operation, her vision was such that she could watch television, dial a telephone and distinguish money.

Rose Morales Williams, legatee under the will, testified she saw and took care of her sister every day from 11:00 a. m. to 11:00 p. m., for many years and up until the time of her death. Her testimony flatly contradicts that of opponent and Florence Richardson, she stating that she saw decedent write on different occasions, such things as grocery slips and lottery slips. She further identified her sister's handwriting and declared that the will was wholly written, dated and signed by her. She also related that decedent watched television, filled her own syringe with insulin, dialed the telephone and managed her own money matters.

A nephew of decedent, Henry Cambre, testified that his aunt watched television with her glasses on and that, on one occasion, he saw her tell time on a clock approximately four inches in diameter from a four or five foot distance. He also saw her squeeze an air bubble out of her syringe in December of 1954.

The most important evidence on the subject of decedent's testamentary capacity was that given by Mr. Richard Garvey, who stated he actually saw her entirely write, date and sign the will on February 9th 1954. In the years just prior to her death, decedent employed Mr. Garvey as her lawyer for the purposes of passing acts

of sale and apparently for advice on various matters.

Leona Meteye, legal secretary in the office of Mr. Garvey, testified that decedent called by telephone on February 9, 1954 and asked to speak to Mr. Garvey, stating to the witness that she wanted to make a will. Mr. Garvey declared that, after he received the message from Miss Meteye, he picked up a plain piece of white paper on the back of which was attached a blue cover, a common method for keeping important papers in the legal profession, and went to decedent's home. He arrived there about 1 o'clock in the afternoon and, after they talked in the living room for about twenty minutes, he and decedent went into the kitchen where the latter proceeded to write the will.

Mr. Garvey testified no one else was in the kitchen other than himself and the testatrix; that he helped to steady her hand several times during the writing of the will and that he placed his hand on her hand to guide the pen to the correct place on the page in order to begin a new line. He emphatically denied dictating the will or that he actually wrote it. He does not remember, but he said it may be possible that he helped her to spell the words "attorney" and "executor" in the will.

Florence, the maid, stated that she was in the living room of decedent's home when Mr. Garvey came there and could see directly into the kitchen at the time decedent and Mr. Garvey were at the kitchen table; that Mr. Garvey placed a white piece of paper on the table on which there already was writing and stated to decedent "I want you to sign your name right there" and that all that decedent did was to write her name, as directed.

It is seen from the foregoing that the evidence submitted anent decedent's testamentary capacity is in direct conflict. However, there is substantial testimony to the effect that not only was decedent capable of writing a will but that she actually did so. In ruling the will valid, the district judge evidently was of the opinion that the affirmative evidence prevailed over the negative. After a careful examination of the record, we cannot say that the judge erred in his finding of fact.

Finally, counsel for opponent maintains that the will is void as it was not entirely written, dated and signed by decedent. This, like the attack on decedent's testamentary capacity, presents a question of fact. Since the will was challenged before its probate, Article 2245 of the Civil Code and Article 325 of the Code of Practice apply (see Succession of Lefort, supra and Succession of White, 132 La. 890, 61 So. 860) and, therefore, the burden of proof was on proponents to establish the validity of the instrument by a preponderance of evidence.

The trial judge was of the opinion that proponents had carried this burden and we think his ruling correct. Mr. Garvey, Miss Meteye and Rose Williams positively swore that the will was entirely written, dated and signed by the testatrix. The only contrary evidence is that of Florence Richardson and the opponent, who admits that his wife signed the will but denies that the body of the will is in her handwriting.

The judgment appealed from is affirmed.