Generally, all questions are first presented to the court of original jurisdiction.

Prohibition and other remedial writs issue after the question has been considered by the lower court.

First. In conclusion, to sum up: The issues were decided in the district court contradictorily, without the least objection on the score of want of jurisdiction.

Second. The case went to the Court of Appeal, and was dismissed because that court had no jurisdiction.

Third. The decision of the Court of Appeal was reviewed by this court, and the application of relators dismissed.

Fourth. On the second application, we would not be justified in setting aside the judgment, unless we were thoroughly convinced that the district court was without jurisdiction.

Fifth. Brought up here as an original question, we must decline to set aside the judgment because of the asserted want of jurisdiction, based upon the Court of Appeal decision as to its own jurisdiction.

The statement above shows that relators' only complaint is that the judgment is an absolute nullity on the ground alleged, to wit, want of jurisdiction.

The statement disposes of the case (as relates to mandamus) under the ruling settled by this court in a number of cases. State v. Le Blanc, 125 La. 967, 52 South. 114.

For reasons assigned, the rule nisi is recalled, applicant's petition is dismissed, and the demand of relators refused, at relators' costs.

(54 South. 138.)

No. 18,353.

Succession of DRYSDALE.

(Dec. 12, 1910. On Application for Rehearing Jan. 30, 1911.)

*(Syllabus by the Court.)*

1. EVIDENCE (§ 76*) — CLAIM OF FORGERY — PRESUMPTIONS.

When a will is presented for probate is attacked on the ground that it is a forgery, and there are pertinent facts relating to the will in the possession of the proponent, and he repeatedly fails to testify when his testimony could clear up many clouded and doubtful things, his failure to testify casts suspicion upon the will, especially when the one asking for the probate of the will is a principal legatee.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. § 96; Dec. Dig. § 76.*]

2. EVIDENCE (§ 573*)—FORGERY—EVIDENCE—CORROBORATION.

While the testimony of handwriting experts that a will is a forgery is not always productive of certainty, and generally requires corroboration, this corroboration is furnished in this case by the failure of the proponent to explain how he acquired a knowledge of the existence of the will, and the place where it was to be found. He had the opportunity to give this information, or his reasons for his inability to do so, and his failure to clear up the doubt that exists in regard to the authenticity of the will is corroborative evidence of the correctness of the findings of the experts.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. § 2399; Dec. Dig. § 573.*]

Appeal from Civil District Court, Parish of Orleans; Thos. C. W. Ellis, Judge.

In the matter of the succession of Julia Pike Drysdale. From an order allowing the probate of a will, the legal heirs appeal. Reversed, with demand for directions.

Woodville & Woodville, for appellants. Percy S. Benedict (A. J. Cahill of counsel), for appellees.

BREAUX, C. J. The alleged forgery of a will presented for probate gives rise to the questions before us for decision.

The decedent, whose purported will was offered for probate, departed this life at her residence in this city on the 19th day of August, 1905.

This extraordinary case, in which the proponent asks for a judgment probating the alleged will, has been before us in different appeals within the last two years.

In one of the towns of Canada the will was found. It is written in due form and strictly in accordance with the laws of that Dominion. It is entirely different as to form from the law's requirement in this state. It was written on a typewriter, and signed, it is alleged, by the testatrix and two witnesses.

She was at the time a resident of New Orleans. Every year for a number of years she repaired to the healthy climate of Canada during the summer, and resided while there with the universal legatee named in the purported will. She liked his wife, who was her stepdaughter. She was devoted to the memory of her late husband who died in Canada and was buried there.

The application of the proponent to probate the will was strenuously and bitterly opposed by the sister and other heirs of the late Mrs. Julia P. Drysdale. They attacked the will as a forgery, and introduced lengthy testimony in support of their averment.

The witnesses for plaintiffs and opponents testified that Mrs. Drysdale thought highly of her stepdaughter, but not of her husband, who is named in the will attacked.

She heartily disliked him, is, in substance, the testimony.

The will in question was deposited by some one unknown in the office of Harris & Lewis, attorneys in Winona, Canada, in which place the principal legatee has his home.

The will was evidently written or dictated by some one who had knowledge of the forms to be followed in writing a will.

Mrs. Drysdale had a legal adviser in Canada who testified that she had consulted him in regard to some business, but that he did not recall that she ever consulted him about making a will.

It was not known by any one connected with the administration of law in any way that she had made a will and that it was deposited as before mentioned. It found its way to the vault of the office of Harris & Lewis, and was in a package on which the name of Mrs. Drysdale was written.

The witnesses to the will in Canada—one the bookkeeper of the principal legatee, and the other the foreman in the management of some industry—had been in his employ over 10 years. They testified that on a certain day Mrs. Drysdale called them together and directed their attention to the will, which they barely read, and that the three (the testatrix and the two witnesses) signed it, and she then requested them to make no mention of the fact that she had made a will.

This was in the year 1903.

In the year 1905, within a day or two after the death of Mrs. Drysdale, her stepdaughter and her husband were notified of her death.

A young woman met one of the witnesses to the will in the city of Winona, where one of the witnesses resided, and informed him of the death of Mrs. Drysdale, and expressed regret that she had not left a will.

This witness stated that he did not recall at the time that a will had been made; i. e., it was only afterward that he recalled the incident.

The other witness to the purported will was about as oblivious in regard to it.

Afterward, both of the witnesses remembered that such a will was signed. It is very strange that neither of the witnesses informed their employer after the death of Mrs. Drysdale that she had left a will leaving to him the bulk of her fortune.

In due time, after the death of the testatrix, the will was probated in Canada, and the judgment of probate and the will were brought to New Orleans to be probated.

The property of deceased was in this city.

The heirs here opposed the probating of the will, and raised a number of issues in opposition to the application to probate it.

The opponents who testified; i. e., relatives of Mrs. Drysdale, members of the Pike family (she, Mrs. D., was a Pike), and a witness, not a relative, who had acted as her agent for many years, testified that the signature to the will was not genuine.

The two witnesses, employés of the principal legatee since many years, who signed the purported will, testified first in Canada under commission, and their testimony was introduced in court here.

At another trial (there were several trials in the district court) these witnesses came here and testified.

After they had testified, as just stated, a detective was sent to the home of these witnesses to the end of ascertaining particulars about the making of the asserted will.

He did not discover anything of any importance. Besides his testimony was very much shaken on cross-examination.

He returned here in time to be heard as a witness, and sought by his testimony to attack the veracity of these two witnesses; he testified about asserted conversations that he had with these witnesses.

The witnesses residing here, testifying against the application of proponent, testified that Mrs. Drysdale always denied that she had made a will. They mentioned different incidents, all more or less pertinent, to prove that it was not reasonable to infer that she had made a will. Even to the last moments of her life, on her deathbed, she said that she had not made a will, or, as she could not speak, she shook her head in answer to a question by Frantz, a witness in the case.

Another fact is invoked by opponents: She had owned, but had disposed of, valuable jewelry, some time before she made the asserted will in Canada, yet this jewelry was included among the effects she had given away.

The point sought to be made by the opponents here is that the principal legatee of the will knew that she owned the jewelry, but did not know that she had parted with it; that had she made the will she would not have included therein jewelry that she had already given away.

Again, years ago, she had an old negro carriage driver in her employ. The will contained a small bequest in his favor—$100.

The testimony of opponents is that the old negro was a drunkard, had proved himself unfaithful, and had been discharged quite a number of years before; that had Mrs. Drysdale been the author of the will she never would have given anything to the worthless old negro; that whoever made the will knew that he had been her carriage driver, and had inserted the small amount to the end of creating the thought that she had signed the will.

There are other facts and circumstances seized upon to show that the purported will is not genuine.

A short time after the death of Mrs. Drysdale, the principal legatee came to New Orleans.

It is stated by witnesses here that his first inquiry was whether a will had been left by the decedent. After he had been informed that there was no will, he strongly advised that a compromise be made and fair distribution of the property.

He was under the impression that his wife, the stepdaughter of Mrs. Drysdale, had an interest. When informed by one of the heirs that she had none, he telegraphed to his wife and to his attorney to repair to the firm of lawyers, Harris & Lewis, before referred to, and see if there was not a package deposited in their office.

They complied and found a package, which

contained the purported will, which he offered for probate, and which is opposed, as before mentioned.

In the lengthy litigation here, this principal legatee was at times placed in delicate positions in court. His acts were assailed and his motives impugned. He was referred to in terms not complimentary by a gentleman of the community, a lawyer of high character and repute. He was "not straight," this lawyer said.

In the presence of all this, he never once sought to testify nor to explain nor to have anything explained or stated in his behalf.

In the first decision in the district court, the district judge mentioned that this proponent had not testified, giving rise to the one inference that he should have testified.

This had no influence upon the proponent, and the case is now again before us without his testimony. There were several trials in the district court, still he did not testify.

The proponent knew, or should have known, that the courts of this state have repeatedly decided—in civil cases, if necessary to explain pertinent facts—a witness should testify. This applies particularly as relates to a universal legatee and proponent to probate a will under the circumstances under which this will was presented for probate.

Louis Frantz, a member of the firm of A. K. Miller & Co., steamship agents, testified that he had been acquainted with the decedent since about 18 years, acted as her agent in her business affairs, and frequently advised her in business matters; knew her handwriting and was familiar with her signature.

He said, when the will was received here:

"They had the signature covered when I came in and they showed me some of Mrs. Drysdale's signatures. Afterward they raised the blotting paper off the signature of the will and I said at once, 'Not her signature.'"

The case was remanded for trial by this court.

During the trial, after it had been remanded, three experts were called as witnesses by the opponents.

One of these experts is the president of one of the local commercial colleges—Mr. L. E. Spencer; another—Mr. Joseph M. Beaser—is one of the professors in the institution; the third is a well and favorably known member of the bar—Mr. E. A. O'Sullivan.

Each testified that he had made a study of the art of penmanship. They amply qualified as experts.

A number of letters of the decedent were introduced in evidence for the test. They compared these letters and a number of the signatures of the decedent with the signature to the will. They examined these different letters, checks, and other papers under a microscope. As witnesses, they gave an account of their work as experts. They were subjected to close and careful examination by learned counsel, of whom it was said in court, and not denied, that he also is well informed in the art of comparative penmanship. The cross-examination by learned counsel showed that he is thoroughly informed upon the subject.

The first of the experts referred to above said that he had made a study of comparative penmanship for about 20 years. He had studied penmanship scientifically. He studied under the best penmen, naming them: Rollings, Ames, and others—specialists in comparative penmanship.

He made, he said, a thorough examination of the various papers in this case under a strong lens.

He testified that, after a careful study of all the documents, he had come to the conclusion that the signature to the will was by one person, and the other papers by another person; that his analysis of the two handwritings and their general characteristics shows positively that the signature to the will was by another person; that his

opinion was inflexible; that he was absolutely positive; "My opinion is so well fixed on it that unless the woman came back to life herself I would not change my mind."

At another time, while under examination, the witness testified that, after he and the other witness (professor in his institution) picked out the general characteristics of the two handwritings, they expressed the opinion that they were written by two different persons, without knowing who were the persons, and without knowing any of the particulars, in which they did not feel the least concern.

He stated, further, that people become experts by constant handling of handwriting; that there is something about the signature almost like a person's face; that a person familiar with it will detect it at a glance.

The other expert, the professor in the school before mentioned, also a student of handwriting and comparative penmanship, stated that he had examined the signatures in every possible way. He had taken letter for letter and characteristic for characteristic, and had come to the conclusion that those said to be genuine were written by the same hand, but that the signature to the will was written by some one else.

The third expert to whom we have referred was equally as positive in giving his testimony.

All the experts testify that it is an imitation.

There is no question. These experts are absolutely sincere.

We are very well aware that the testimony of experts in penmanship is not always of itself positively certain.

We concede it generally requires corroboration of some kind.

No attempt was made to test their knowledge on cross-examination by comparison in the manner frequently resorted to.

127 LA.—29

Such a test, if successful, will demolish the testimony of the greatest experts.

These experts are corroborated.

There is corroboration because of the stepson-in-law's studied silence.

The theory of one of the experts was that the decedent held her pen sideways—slanting.

By using the miscroscope, her handwriting was very much enlarged to the eye.

From this he found, as he testified, that the strokes of her pen were different from those of the signature to the will.

He reproduces characteristics from her genuine handwriting as follows:

The strokes illustrating from the signature to the will are:

The "J" of the signature of the decedent:                    Of the will:

                    

"Julia" of Mrs. Drysdale as written by her:

The following is said to be an imitation of the signature of the decedent which was the signature to the will:

In argument, learned counsel for proponent has criticised the theory, and has sought to show its error.

In spite of the able criticism and the ingenious argument of counsel, there are positions taken by these experts that we have not succeeded in finding entirely erroneous.

We readily concede the earnestness and sincerity of learned counsel. It has left us unconvinced, none the less.

It must be stated that no importance is given to the testimony of the detective except in one respect; but that in a moment.

One of the purposes in sending the detective to Canada, it was stated, was to discover where and by whom the will was typewritten, and to ascertain if any one except the two witnesses before referred to had ever heard anything about this will.

The decedent was not a writer on the typewriter. Practically knew nothing of that art.

No lawyer—no typewriter—had ever heard of the will, although it must have been very much talked about after it was found.

The two witnesses to the will referred to with confidence are not always direct in their testimony; they do not directly prevaricate, but they contradict each other in certain parts of their testimony.

When one of them, the foreman in the employ of the proponent since many years, was asked, "Why did you fail to mention to him, the proponent, or to some other beneficiary of the alleged will that there was a will?" "I had forgotten about it," he said.

A failing memory it is that will forget such an act in the short space of two years.

Afterward, when questioned by the wife of the proponent, he said that he had forgotten that he had ever signed the will as a witness.

At one time he gives as his reason that he had forgotten all about the will; at another, that he had been requested by the testatrix not to mention it; and still at another time he said that she had made no such request.

Questions to one of the witnesses:

"Q. Why did you fail to mention to Thomas Carpenter or to some other beneficiary of the will that a will was in existence in which they were interested?

"A. I had forgotten about it.

"Q. When did you hear of the alleged will next after September 13, 1903, date of the will?

"A. Mrs. Carpenter told me about it, the first I heard of it."

Again, to the witness Jones:

"Q. What did Mrs. Carpenter ask you when she met you and spoke to you about the will?

"A. She asked me if I knew that I was a witness to her stepmother's will.

"Q. Yes; what did you tell her?

"A. I told her I had forgotten it, but if my name was there it was all right, and she said my name was there."

Again, as to Mrs. Drysdale at the time the will was made:

"Q. Did Mrs. Drysdale say anything to you about keeping the will secret, and not letting any one know that she had executed the will, and requested you to say nothing about it to any one else?

"A. No; she did not."

After that, according to one of the witnesses, she did make the request.

We would be more reluctant to judge these signatures of the witnesses as we do, were it

not that there is mystery from whom the proponent obtained information that there was a will in the office of the attorneys at law in Winona. It is not explained by him how the information was obtained, nor has he, as a witness, sought to throw the least light upon the subject.

Besides, the following in matter· of the succession should have been explained by the principal legatee, who is also one of the executors.

The entry herein inserted is an extract from the inventory:

"Twenty shares of the capital stock of the Traders' Bank of Canada, Toronto, Canada, as per certificate No. 1,787, in the name of the deceased, par value one hundred dollars.
"Note here:
"Mr. Thomas H. P. Carpenter, one of the executors, stated that he had inquiry made at the office of the above bank concerning the stock covered by said certificate No. 1,787 for twenty shares, as aforesaid, and found that same had been sold by the deceased on her last visit to Canada, and therefore no longer belonged to her or her estate."

It appears in evidence at another time that the stock in the name of Mrs. Drysdale was transferred by Carpenter as legatee on August 24, 1905, to H. Howard Shaver pursuant to a power of attorney, signed Julia P. Drysdale, appointing T. H. P. Carpenter as her attorney.

Mrs. Drysdale had been dead eight days, and a day or two after her death the proponent of the will was aware of her death, and yet he transferred the stock. It was said in his behalf that he did not know that the power of attorney expired at the death of the principal.

This case was remanded, it may be stated, to give an opportunity to the proponent to explain certain unknown phases of the case—mysterious situations, it may be said.

Of this he has not chosen to avail himself.

The decedent was stopping at the residence of Carpenter and his family. The will was signed under peculiar circumstances, if it be as alleged.

It *fell* into a package of which no one knew anything, and, yet, at opportune time, a dispatch was sent as stated and it was found.

Why was this not explained, or, if not explainable, why was not the statement of inability to explain made?

Our attention was invited to Bell v. Norwood, 7 La. 96, text 103, in which the court held, in substance:

The testimony of one of the witnesses to signature of testator not impeached will not be invalidated by the testimony of other witnesses who deny that it is the genuine signature.

There are a number of facts and circumstances not explained, besides the testimony introduced to prove that it was not the signature of the late Mrs. Drysdale.

As to the reputation of the witnesses to the will: The occupation of one of them at least ought to have been explained; it was not.

When inquired into on examination of a witness as to his occupation, that part which ought to have been made clear by further testimony was left unexplained on proponent's objection on the ground that it was secondary evidence.

For reasons stated, it is ordered, adjudged, and decreed that the judgment of the district court probating the will is avoided, annulled, and reversed, and proponent's demand for probating the will is rejected.

It is ordered, adjudged, and decreed that there is judgment in favor of plaintiffs, opponents to probating the will, recognizing them as the owners of the property of the succession of the late Mrs. Julia P. Drysdale, and, as such, it is ordered, adjudged, and decreed that they be placed in possession, and the demand of the proponent and all others, who claim under the will, is re-

jected. All costs of these proceedings, in both courts, to be paid by proponent and other claimants under the will who are parties to these proceedings.

## On Application for Rehearing.

PER CURIAM. Many of the facts suggest "unusual" and "irregular" as characterizing the making of the purported will.

Witnesses have testified that to the last moment the decedent denied that she had made a will.

She executed it, it is asserted, without having consulted an attorney, although there was an attorney in Winona, Canada, whom she had consulted in other matters.

Furthermore, the purported will was evidently written in accordance with legal advice, or by a person having knowledge of law. - The lawyer, or well-informed person, was not found.

It was written on a typewriter. The testatrix, Mrs. Drysdale, did not know how to use a typewriter.

Within two short years, attorney and typewriter are not heard of at all who had the least knowledge of the will.

It was found in the office of a firm of attorneys; they had never heard of this will.

The witnesses to the will, on hearing of the death of the testatrix, remembered very little of the will.

In the brief for rehearing, it is stated, in substance, that in view of the findings of Judges Ellis and King, and of the opinion rendered by this court before the last decision was rendered, there is error in the last opinion.

It is also stated that it was not thought that there was the least necessity to place the foreign executor on the stand as a witness, or to have him examined as a witness under commission.

The last-named judge, King, did not place the utmost reliance in the testimony of the witnesses to the will. He declined to probate the will and said:

"Considering, further, the length of time between the signing of the will and its being found at the suggestion of Carpenter, one of the executors and residuary legatee, and his wife, the principal legatee, neither of whom is an heir to the deceased, and during said time no evidence is produced to show where the will was, nor any evidence produced to show how the will came to be in, or by whom placed in, the office of Harris & Lewis; considering, further, the acts and conduct of Carpenter, as disclosed in the record, *and his failure to testify herein*" (italics ours)—he refused to probate the will.

It is true that on appeal this decision was reversed, for reasons stated in our opinion at the time, and subsequently the case was set aside and remanded, in order to enable the parties to introduce other evidence.

After the case had been remanded to the district court, it was tried and other evidence heard. The decision in the last court was for proponent.

From this decision an appeal has been taken to this court.

Here it has been considered, and the conclusion before expressed arrived at. The opinion of the lower court was reversed.

The foregoing speaks for itself; it shows conclusively that there was the best of reasons to place Carpenter on the witness stand; for directly, it was stated, in the written opinion, supra, that he had failed to testify.

Furthermore, in the brief for a rehearing, it is said, in substance, that we overlooked the affidavits of two witnesses who had recanted all to which they swore, which reflected on the witnesses to the will.

How these witnesses were imposed upon, and how it was brought about, is not stated in the recanting affidavits.

We purposely did not heretofore refer to these affidavits. Now that they are pressed upon our attention, we will consider them, not as bearing upon the merits of the case. They will be considered only because they are pressed upon our attention in such a way

and with such comments as render it proper and necessary that we should.

We will now state that, in addition, the brief for rehearing refers to the brother of Carpenter, the executor, who has been quite outspoken in regard to this executor, and to whose affidavit we refer later.

We consider all these in connection with the first affidavits only upon the question whether we should remand the case to have this testimony authenticated.

Since we notice part of these affidavits, in fairness, the two will have to be noticed. They are all ex parte, and receive no notice whatever save for the reasons before stated. On May 27, 1910, in answer to questions propounded to interrogatories entirely informal, because too late and not answered contradictorily, a witness at Stoney Creek, Canada (Albert Case Springstead) swore that he had known Carpenter for years, in whose employ had been the two witnesses to the will for 10 years—close friends and worked together; that from his knowledge of the character of Jones, one of the witnesses to the will, and his observations of the working together of Jones and Carpenter, he had no hesitation in saying that Jones is a mere tool in the hands of Carpenter, not so much because he would intentionally do wrong as from the fact that he would blindly follow his instructions and be lead by him.

He swore, further, that he believed that Henry McGill, the other witness to the will, works together with said T. H. P. Carpenter in all his schemes, and would follow said Carpenter's wishes without hesitation, and without any consideration for the propriety or impropriety of the transaction whenever said Carpenter's interests were involved.

That he made the affidavit without ill will, and only firmly believing that in these expressions of opinion he was only voicing the sentiments of the general community.

On the 27th day of May, 1910, Frederick Felker, of the same place, in a separate affidavit, swore to substantially the same.

On the same day as the last day above stated, Charles William Franklin Carpenter, of the township of North Grinsby, in the county of Lincoln, brother of the legatee in question, made affidavit that he was, prior to the month of February, 1904, a member of the firm of C. P. Carpenter & Sons, composed of T. H. P. Carpenter, C. P. Carpenter, and C. W. F. Carpenter, and carried on the fruit and nursery business at the village of Winona, in the county of Wentworth, and that in that month he withdrew from the firm on account of difficulties with the above T. H. P. Carpenter.

That Alva E. Jones was employed for a number of years during his partnership, and has since been employed by T. H. P. Carpenter, and from his personal observation that he would follow T. H. P. Carpenter without hesitation.

That Harry McGill was employed for a number of years, while he was a member of the firm, and from his personal observation he would consider that he (McGill) would cooperate in any transaction said T. H. P. Carpenter would see fit to put through.

That he entertained no ill feeling against either of these two witnesses.

In the first affidavit, to which our attention is particularly called in the brief, Springstead, the affiant, swore, in substance, that he never intended to reflect upon Jones, of whom he knew nothing at all discreditable; on the contrary, he refers to him favorably, and says that, as we understand, he was taken by surprise—how, is not explained.

He says not a word about McGill, and it follows retracts nothing as to the latter.

Felker swears that he also did not intend to reflect against these witnesses, naming both.

Carpenter, the brother, does not appear to have recanted or recalled anything.

We must say that this is not much of a vindication; certainly it is no vindication by Springstead in so far as McGill is concerned.

Altogether, these are extraordinary affidavits.

They are not of such character, from any point of view, as to inspire confidence.

How men can swear as they have sworn, and afterward change, is not easily explained.

Furthermore, under the laws of Canada, while a will may be typewritten, it must, none the less, be a complete will.

The purported will was presented to the district court, to be probated, on separate sheets.

The judge of the district court, King, rejected the demand for probating this asserted will, as the sheets were separate sheets—not fastened together; that was in the first appeal which came to this court, and was reversed by Justice Land as the organ. Subsequently this decision was recalled, and the case remanded.

He (King) in the decision he rendered held that it was an easy matter to change sheets or substitute others.

After the case had been remanded, other evidence was heard, of such a character as to occasion us to pause in presence of the fact that the sheets on which the purported will was written were loose sheets.

When the case was remanded for another trial, it was thought that the questions of fact in regard to which there was some doubt and which were mentioned would be explained, and all facts and circumstances would be made reasonably clear. It was mentioned in the opinion that Carpenter had not testified (quoting):

"The asserted failure of Carpenter to testify and to his personal acts and conduct."

Before concluding, we will state six witnesses have testified that the signature is not genuine. There are many pages of testimony to about the same effect.

Again, in favor of proponent, witnesses have testified.

They did not identify a complete will; only the last page.

The evidence shows that in Canada a complete will must be presented for probate.

In the court here, on the face of the papers, there was not a complete will, only different pages, which witnesses failed to identify as forming part of the will; a presumption that does not commend itself under the facts and circumstances.

Wills are made to be probated and executed. They are not ordered to be probated and executed unless complete. Wills are not made in separate sections on different pages; not attached and identified with reasonable certainty as one document.

This case was remanded in order to enable the proponent to make sufficient proof.

The last sentence expresses the extent of our decision.

We are of opinion that, taking the evidence as a whole, there was not sufficient proof to probate the alleged will.

The onus of proof under the order of court was with proponent. See Succession of Drysdale, 124 La. 256, 50 South. 30.

This case has been before us a number of times. The issues have been considered again and again until they have become familiar subjects.

Litigation must come to an end.

The proponent has had ample opportunity to prove his case.

Application for rehearing refused.