[No. 22765. Department One. April 24, 1931.]

*In the Matter of the Estate of* FRED ZIMMERLI, *Deceased.*[1]

*Robert A. Devers* and *Wettrick, Wettrick & Flood,* for appellant.

*Chadwick & Chadwick,* for respondents.

HOLCOMB, J.—Fred Zimmerli, born in Switzerland in 1856, came to the United States as a youth. He married in Illinois and engaged in business as a tailor. One daughter was born to him and his wife. Later, he removed to St. Louis with his family where he followed his trade. When the daughter was about ten years of age Mrs. Zimmerli obtained a divorce and was awarded

[1] Reported in 298 Pac. 326.

the custody of the daughter. Within two years after the divorce, both of the parties again married. The daughter continued to live with her own mother, but visited frequently with her father and step-mother while they lived in St. Louis.

Zimmerli removed to California, and after the earthquake there, came to Seattle. During this period he and his second wife wrote frequently to his daughter. After the death of his first wife, Zimmerli and his second wife went to St. Louis and visited the daughter. Upon the death of his second wife, Zimmerli notified his daughter, and shortly thereafter wired her to come to him in Seattle. The daughter and her husband had left for Seattle before receiving his wire.

Zimmerli had several nieces and nephews in St. Louis, one of whom, a widow, had come to Seattle before the visit of his daughter and her husband, to keep house for him. Shortly after her arrival, he made a will in her favor. She remained with him about two weeks. Zimmerli made several wills during the last few years of his life, in one of which he gave one-half of his estate to his daughter, Edna Thorson.

In May, 1917, Zimmerli went to Switzerland and visited an aged sister who was blind. While there he met several nieces he had never met before. On his return from Switzerland, he met another niece in Philadelphia, who died while he was there. After his return from Switzerland, Zimmerli made a will in which he made bequests to his nieces and nephews in Europe and in the United States, except one nephew, Fred Zimmerli, of Portland, and gave his daughter one-eighth of the estate.

After returning from Switzerland, he spent a short time in Seattle, then sent his securities to St. Louis and went there to reside with his daughter. During his stay there, the city was visited by a tornado, and the

home of his daughter was destroyed. He returned to Seattle and lived in a hotel. Witnesses testified that, while living at the hotel before his last visit to his daughter, Zimmerli stated that he was going to make a will leaving all his property to his daughter, Mrs. Thorson, and to his blind sister.

Zimmerli became ill in January, 1929. The daughter came from St. Louis in response to a message from Zimmerli's doctor, and remained in Seattle about twelve days. Her father then appeared to be improving, it seemed to her unnecessary to continue the expense of staying in Seattle, and she returned to her home. Zimmerli died April 11, 1929, and one Sprague immediately applied for letters as special administrator. The safety deposit box used by Zimmerli in his life time was opened and a will was found, dated February 23, 1928, naming Fred Strasser, Swiss consul, as his executor. In this will, he directed that his estate be divided into two parts: The first part to be divided into four shares, one of which was devised and bequeathed to his daughter Edna, Mrs. Thorson, the other three shares of the first part to certain nieces and a nephew named Charles Zimmerli; the second part to be divided into eight shares, devised equally to eight named nieces and nephews, the children of a deceased sister in Switzerland.

The Portland nephew, while visiting Seattle during the illness of his uncle, also found a will dated September 6, 1927, which had the name of the testator cut out, and in which will the daughter Edna had been devised and bequeathed one-half of the testator's estate, the other half being divided into eleven shares, which were divided among certain named nieces and nephews.

The will of February 23, 1928, being duly executed in the presence of the required witnesses, was admitted to probate in the superior court of King county and

Strasser, the executor, proceeded to administer upon the estate.

About a month after the probate of the will, Edna, the daughter, then in St. Louis, came to Seattle. She visited and cultivated the acquaintance of a Mr. and Mrs. D. C. Taylor, who were purchasing real estate from Zimmerli on contract. She complained to them that her father had been unfair to her in his will, and wept in their presence. She stayed in Seattle for some time, and finally asked the executor for some of her deceased father's personal effects.

Two suit cases belonging to her father, which had been left in his room in the hotel when he was taken to the hospital, were found deposited in a storage room. These suit cases had been twice examined by the Portland nephew and only some unimportant papers found in them. Among other papers was the will of September 6, 1927, from which the signature had been cut. Mrs. Thorson went through the contents of the suit cases while they were still in the hotel, and asked the housekeeper to watch her in her search. When Strasser qualified as executor, he took possession of the suit cases. He made a careful and thorough examination of their contents, being assisted therein by his office assistant.

Mrs. Thorson was given the old suit cases, which she took with her and returned to St. Louis. After her return to her home she made a remarkable discovery of another will which she said was found in an old shirt, which had been laundered in Seattle, within the laundry folder in a large sealed envelope without any writing upon the envelope. This discovery happened in the presence of a neighbor lady and her daughter. The neighbor lady had a husband and Mrs. Thorson intended to give the shirt to the neighbor if she would accept it. When undertaking to show the

neighbor lady the shirt, the envelope dropped from the folder.

In September, 1929, Mrs. Thorson wired the executor of the discovery of this other will. She had a photostatic copy made before sending it to Seattle, where it was admitted to probate upon the formal testimony of Mr. and Mrs. D. C. Taylor, the attesting witnesses thereto. Within six months after the admission to probate of this will, on January 27, 1930, this contest against that will was instituted.

The trial judge, after examining all the evidence in the case, and hearing the testimony of the subscribing witnesses to the last will probated, rejected the evidence of the subscribing witnesses to the purported will, accepted the testimony of one expert witness who demonstrated his testimony by ocular demonstrations and analyses, discounted the testimony of another expert in handwriting, although that expert was a bank's expert on handwriting, and found that the preponderance of the evidence, oral and documentary, was against the genuineness of the last will.

Mrs. Thorson appeals from that decision.

In support of her appeal, it is vigorously insisted that, since Rem. Comp. Stat., § 1387, prescribes that in any contest against a will, if probated, the burden of proving the illegality of such will shall rest upon the person contesting such probation or rejection, that burden was in no wise sustained by the contestants in this case. It is forcefully argued that there is nothing more than suspicion against the genuineness of this will, and that suspicion, however great, is not sufficient to nullify it after being admitted to probate; citing *Points v. Nier*, 91 Wash. 20, 157 Pac. 44, Ann. Cas. 1918A 1046; *In re Murphy's Estate*, 98 Wash. 548, 168 Pac. 175; *White v. White*, 111 Wash. 354, 190

Pac. 1003; *In re Adin's Estate,* 112 Wash. 379, 192 Pac. 887.

After having carefully examined and considered all of the evidence of the subscribing witnesses, the testimony of the experts on handwriting, all the exhibits of handwriting in evidence, and the very peculiar circumstances under which this purported will was supposed to have been discovered, we consider that there is much more than mere suspicion against the genuineness of the questioned will.

It is somewhat significant that no testimony was procured from Mrs. Thorson's neighbor lady or her daughter, as to the manner in which the questioned will was discovered. This circumstance, in itself, indicates very strongly that the will was discovered by design and not by accident. *In re O'Connor's Estate,* 105 Neb. 88, 179 N. W. 401.

It is a significant fact that, although the Taylors had some correspondence and personal intercourse with Mrs. Thorson, no mention was made by either of them to her that they had witnessed any will by Zimmerli.

The trial judge filed a memorandum opinion wherein he carefully analyzed the evidence of the experts on handwriting, and disclosed that he utterly discredited the testimony of the subscribing witnesses.

The testimony of attesting witnesses to a will may be overcome by any competent evidence, facts and circumstances. *Baird v. Shaffer,* 101 Kan. 585, 168 Pac. 836. It is also there held that expert and opinion testimony as to the genuineness of handwriting is competent, and the credence and weight to be given to such evidence is for the triers of the facts. See, also, *In re O'Connor's Estate, supra.*

The trial judge, like the expert for contestant, examined the questioned signature in conjunction with known and many other acknowledged signatures of

Fred Zimmerli, made examinations of his own with a powerful glass and microscope, and found that the demonstration made by the expert for contestant was correct. Among other things, the court found three characteristics of Fred Zimmerli's handwriting which stood out boldly and firmly: (1) the light stroke at the end of the "d" in "Fred"; (2) the careless dotting of the "i's" and the careless dotting after the letter "F"; (3) the distinct break between the "m's" in the name "Zimmerli" and the pause and hesitation and break between the "m" and "e" in the name "Zimmerli." The questioned signature did not conform to these characteristics in any respect.

An imitation of a writing will naturally resemble the writing imitated, and most errors in identifying writing are due to the improper assumption that this general character is proof of genuineness. Osborn on Questioned Documents (2nd ed.), 287. *In re O'Connor's Estate, supra.* See, also, *Sharon v. Hill,* 26 Fed. 337 at 358; *Boyd v. Gosser,* 78 Fla. 64, 82 South. 758, *Gordon's case,* 50 N. J. Eq. 397; *Succession of Drysdale,* 127 La. 890, 54 South. 138; *Succession of White,* 132 La. 890, 61 South. 860; notes to 6 A. L. R. 500 and 12 A. L. R. 212.

The trial judge had the advantage of seeing and hearing the witnesses and of marking their demeanor on the witness stand. We find nothing that would sustain a holding that a preponderance of the evidence is not with the contestants. *In re Connolly's Estate,* 89 Wash. 168, 154 Pac. 155, L. R. A. 1916D 635.

It is also insisted by appellant that the contest was not timely. Rem. Comp. Stat., § 1385, allows six months within which to appear and contest any will after its admission to probate. This contest was initiated well within the six months after the probate of the questioned will.

250

██ Appellant further contends that there was no authority in the trial court to allow attorney's fees as costs where the probate of a will is revoked. Rem. Comp. Stat., § 1389, authorizes the allowance of attorney's fees in a reasonable sum when a will is revoked. The amount allowed is not objected to as unreasonable. *In re Statler's Estate*, 58 Wash. 199, 108 Pac. 433, sustains the allowance.

We can find no valid reason in the record for reversing the findings and judgment of the trial court.

Affirmed.

TOLMAN, C. J., MITCHELL, PARKER, and MAIN, JJ., concur.