[No. 26804. Department Two. January 4, 1938.]

*In the Matter of the Estate of* GEORGE A. BROWNE,
*Deceased.*

HENRIETTA RIDGELY BROWNE, *Respondent,* v. CHARLOTTE
MUNDEM, *Appellant.*[1]

*Alfred Thompson* and *John F. Walthew,* for appellant.

*Dillon & Carney,* for respondent.

MILLARD, J.—On April 29, 1936, an instrument purporting to be the last will and testament of George A. Browne, who died March 4, 1936, was admitted to probate in the superior court for King county. That instrument reads as follows:

"Seattle Wash.
July 4th 1933.

"Will of Geo. A Browne:

"This is my last will and testment of the Geo. A Browne that I am of sound mind not acting under duress, menace, fraud by anybody but myself. And at the same time I will my entire estate to Charlotte Mundem who has taken care of me for so many years.

"Ridgely Browne I will ($100.,) dollars who I disown. I devise and bequeath to my brothers Jack

[1]Reported in 74 P. (2d) 913.

Browne and Belmore Browne the sum of ($5.00) dollars each. And unto my mother Ella H Browne I leave the sum of ($10.00) dollars.

"Charlotte is my loyal sweetheart and we have been pals so many years and some day my wife.

"And everything I own included.

"This is my last will for you to follow upon my demand.

"Chas. V LaFarge to be executrix of said estate.

"In witness wherof I hereto set my hand and seal to this will, typewritten on this sheet of paper and this the 4th day of July in the year of 1933.

"(Signed)   GEO A BROWNE

"Witnesses:

(Signed)   PAUL C MULLIGAN
OLIVE JONES
AMY MUNDEM"

On the ground that the signature of her father to the purported will is a forgery, and that the alleged will was not attested by any witnesses, Henrietta Ridgely Browne, a minor and adoptive daughter of the deceased, brought this action by her guardian to set aside the will.

The cause was tried to the court, which found:

"  .   .   . that said purported will was not prepared by said decedent and said purported will was not signed by said decedent or by any other person under his direction in his presence.

"That the Court discredits all testimony that said decedent, George A. Browne, prepared said purported will and signed the same as his last will and testament.

"That said decedent did not sign said purported will in the presence of two witnesses, said purported will was not attested by two witnesses; that said purported will was not subscribed by two witnesses in the presence of the decedent; that the purported signatures of the purported witnesses upon said purported will were placed thereon after the death of said decedent."

A decree was· entered setting aside the will and vacating the order admitting same to probate. Charlotte

Mundem, the principal beneficiary under the purported will, appealed.

The evidence amply sustains the finding of the trial court that the signatures of the purported witnesses upon the alleged will were placed thereon after Browne's death. Our disposition of this appeal on that ground renders it unnecessary to consider any other question.

A writing is not valid as a will unless it complies with the provisions of the statute. The statute requires that the testator's signature shall be attested by two or more competent witnesses, who must subscribe their names to the will in the presence of the testator, by his direction or request. Laws of 1929, chapter 21, § 1, p. 18; Rem. Rev. Stat., § 1395 [P. C. § 10022].

The evidence is summarized as follows: Browne was educated at an eastern preparatory school and attended Harvard university. In fact, he was a man of superior education, and was quite a linguist—he spoke three languages. He was a resident of Tacoma, Washington, until 1917, when he joined the United States Navy and participated in the World War. His wife then moved from Tacoma to her former home in Baltimore, Maryland, where she died in 1922. Browne never remarried. The respondent, who was born in May, 1916, was adopted, when a baby, by the deceased and his wife. The appellant was employed by Browne and his wife as a servant, prior to his enlistment in the Navy in 1917.

Except for visits, Browne did not return to this state until 1930. When his wife died, the adopted daughter (the respondent) lived with her adoptive mother's relatives in the East until Browne returned to this state in 1930. Browne, who was employed by the American bureau of shipping, established a residence in Seattle, where he and the respondent made their home.

About September, 1932, the appellant again entered the employ of Browne as a domestic. She was paid fifty dollars a month, regularly, until Browne's death. The appellant's sister, Amy Mundem, whose name appears as a witness on the contested will, assisted the appellant in Browne's household during this period. Other servants were employed by Browne between 1930 and 1932. On February 28, 1936, Browne was taken to the hospital, where he died March 4, 1936.

On March 9, 1936, Charles V. LaFarge was appointed administrator of the estate of the deceased. The appellant and her sister, Amy, remained in Browne's house until the trial of this action, where they had access to all of his papers. The typewriter upon which the will was typed was in Browne's house as late as February 20, 1936, or eight days prior to the time he was taken to the hospital. Shortly thereafter, the typewriter disappeared. Appellant testified that Browne destroyed it. An employee of an ink and chemical company, who was a witness on behalf of respondent, testified that the appellant asked her, ". . . if I thought she should destroy the typewriter that had been used in making this paper . . ."

Approximately seven weeks after the death of Browne, the administrator and his attorney were notified by appellant of the finding of the will which is the subject matter of this controversy. One week later, that paper was admitted to probate. We note that this will, which gives practically all of Browne's estate to appellant, names Charles V. LaFarge, *who was already acting as administrator,* as "executrix." This is some evidence that a man as well educated as Browne did not prepare this will. He would not have used the feminine gender where the masculine should have been employed. The appellant, who testified that she attended school and went as far as the seventh grade,

sometime previously had acted as executrix of the estate of her deceased uncle. These facts, together with others, not only establish the fact that Browne did not prepare this paper, but tend to prove that appellant, or someone associated with her, of like limited education, prepared the purported will.

The same witness who testified respecting appellant's inquiry as to the destruction of the typewriter which appellant contends was used to prepare the so-called will, testified that, on May 12, 1936 (which was subsequent to the conference of the attorneys, the administrator, and others interested in the will, at which conference the signature on the will and the genuine signatures of Browne were compared), Amy Mundem, appellant's sister,

" . . . offered me some money she had in her hand, and any amount more, she said, if I would testify either for them or that I had never seen them."

On September 17, 1936, appellant's deposition was taken. She then stated that there were no other papers or documents except those which had already been examined in the office of her attorney; however, on December 17, 1936, following a number of demands for all of the records of the estate, the appellant surrendered various checks and other papers. Among those papers are documents which a handwriting expert testified had been tampered with by someone in an effort to make the signature resemble the signature claimed to be that of Geo. A. Browne on the alleged will.

It is clear that either appellant or someone on her behalf tampered with canceled checks of the deceased and forged entries in his diary. While the tampering with the checks and the forgery of entries in Browne's diary subsequent to his death, would not invalidate a valid will, it hardly seems probable that one in good

faith would offer forged documents to sustain a valid will.

This conduct is inconsistent with appellant's testimony that she and her sister knew since July 4, 1933, when this paper it is claimed was prepared, that the will was in existence, and that they knew that, under it, the appellant was given all of Browne's property. It is rather odd that, if appellant and her sister possessed such information, Browne never informed her, and she never made any inquiry, where he kept the will, although she insists she was his fiancee. There is testimony in the record that the appellant told one of the witnesses, after Browne's death, that Browne did not make a will, although she had endeavored many times to induce him to do so. There is no record that the appellant, or her sister, ever told anyone that a will had been executed.

Appellant testified that the matter of his marriage with appellant was broached to Browne while he was in the hospital, and that he could not answer, yet he was able to say that he wanted to leave everything to her. Surely, it would have been the natural thing for the appellant to then have inquired of Browne where he had placed the will she now contends he executed in 1933. She made no such inquiry. Instead, she made a special trip to a law office and had a new will prepared for the signature of Browne. By that instrument, substantially all of the property of Browne was given to appellant. Appellant testified that Browne never signed that will because he was out of his mind.

A Mrs. LaFarge accompanied the appellant to the office of the attorney for the preparation of this will which Browne was to sign before he died, but appellant never mentioned to this lady that Browne had already made a will. According to her testimony, the first person the appellant ever informed that a will was

in existence was Mr. LaFarge, the administrator, after Browne's death. Mr. LaFarge denied that appellant told him a will had been executed. Appellant explained that she refrained from asking Browne while he was in the hospital anything concerning the whereabouts of the will, because, "I didn't bore him to death. I lived up to the doctor's orders." The steps she took to secure his signature to a new will, belies this statement.

One of Browne's nurses testified that, while Browne was unconscious, the appellant inquired whether the nurse would sign a will as a witness. That is, if the appellant brought down a signed will, would the nurse sign such a will as a witness. Appellant further informed this witness that she, the appellant, could sign Browne's name as well as Browne. The nurse refused to sign a will under such circumstances.

On March 9, 1936, appellant took a paper to the office of a handwriting expert in Seattle. That paper was a will bearing a purported signature of a testator, but no signatures of witnesses were present on the paper. This expert testified that the will now challenged was similar to the one appellant exhibited to him, and that the only signature upon the document was the Geo. A. Browne signature. According to the testimony of this witness, appellant's sister, Amy, accompanied appellant to the expert's office.

The story told by Amy, appellant's sister, and appellant to this witness was, "that this certain man had passed away;" that he was indebted in a considerable amount of money to appellant, who had helped him to buy a house, and that he intended to give his property to her. When the expert inquired whether appellant had anything other than the will as evidence of the indebtedness, and she answered in the negative, he advised her to consult an attorney, as this document

which she showed to him was not a legal document because no witnesses had signed it. Further testimony of that witness was as follows:

"Q. Did either of them state to you that a will had been executed? A. I asked them specifically whether another will—whether they ever knew of another will, and they told me they did not. Q. What did they want you to do? A. Well, then she suggested to me, suggested about when I told her about the witnesses, she says, 'Well, can't we put some on there? Can't we do something about that?' Q. What did you tell her? A. I told her that was the best way to get in jail that I knew. I told her further more, I said, 'People come to me sometimes to find out if signatures are forgeries, but,' I said, 'it is a very rare occasion that they ever come here and ask me to do anything like that.'"

When appellant first testified, she stated she never called on this man and did not even know him. She insisted that she had no occasion to call on him. Subsequent to a recess, she modified her testimony, and then testified that she visited this witness, but she did not show him a paper of any kind; she called to see him "about names and different things." This is in conflict with another portion of her testimony which it is unnecessary to recite.

The witness Olive Jones, whose signature appears upon the will as a second attesting witness, admitted that her testimony at the probate proceeding that the will was typed and signed in the dining-room, was untrue. She testified that the purported will was brought to her house about three or four weeks subsequent to Browne's death; that she had never seen this document prior to that time, and when she first saw it, only the purported signatures of Browne (as testator) and Mulligan (as attesting witness) were on the paper. She never saw Browne sign this paper. When the will was brought to her house, three or four weeks after

Browne's death, she was induced by appellant and appellant's sister to sign the paper as a witness. She testified she did not realize the seriousness of what she was doing, and her only reason for placing her signature on the purported will was not for money, but merely as a neighborly act.

Appellant testified that all three witnesses signed immediately after Browne. The testimony of Mrs. Jones, that she signed the paper in question as a witness after Browne's death, and that it then had only the Browne and Mulligan signatures on it, is corroborated by the handwriting expert that the Mulligan signature was entirely dry before the Jones signature was written, and by the two witnesses who saw this paper before there were any signatures of witnesses thereon.

The testimony of Mrs. Jones is not contradicted. While Mulligan testified he saw Browne sign the will, and that he signed it in Browne's presence, he refused to testify that he saw Mrs. Jones or Amy Mundem sign the will at all. Amy Mundem testified that she saw Browne prepare the will, and that she and the other witnesses signed it.

The trial court did not believe the testimony of appellant or her sister, nor can we, after our examination of the record in this case.

"The trial judge had the advantage of seeing and hearing the witnesses and of marking their demeanor on the witness stand. We find nothing that would sustain a holding that a preponderance of the evidence is not with the contestants." *In re Zimmerli's Estate*, 162 Wash. 243, 298 Pac. 326.

The language above quoted is apt in the case at bar. The evidence is overwhelming—it would unnecessarily extend this opinion to review all of it—that the three signatures of witnesses were placed upon the purported will subsequent to the death of Browne.

There was not the attestation required by the statute, hence, the instrument is not a valid will.

The judgment is affirmed.

STEINERT, C. J., BEALS, BLAKE, and ROBINSON, JJ., concur.