HARDY, Judge.
This suit, involving the validity of a purported last will and testament by the decedent, Mary Ann Craig, represents a contest between the claims of one Richard L. Flores, legatee under the provisions of said will, appearing herein as intervenor, and Mrs. Emma Mae Smith, sister and legal heir of the decedent, who appears as opponent to the probate of said will. Opponent appeals from judgment sustaining the validity of the purported will.
Mary Ann Craig, age fifty-five, died on June 13, 1959, survived by her husband, Tom Craig, eighty-five years of age, leaving no forced heirs. Decedent’s succession was opened on June 17, 1959, by counsel employed by the surviving husband, and an order issued authorizing the search for a will. Examination of the deceased’s bank box disclosed no will and the succession proceedings were continued as with respect to an intestate succession. Mr. Frank W. Grigsby, a neighbor and friend of decedent and her surviving husband, was appointed administrator, and on September 18, 1959, a tableau of distribution was approved. On the same .date the administrator filed a petition setting forth the discovery of an instrument of writing dated July 28, 1958, purporting to be the olographic last will and *593 testament of Mary Ann Craig, which he offered to the court for probate. Subsequently, Richard L. Flores presented a petition of intervention, representing himself to he a legatee under the will, and prayed that the same be admitted to probate, registered and executed. Emma Mae Smith, representing herself to be the sister and heir at law of the separate and para-phernal property of decedent, opposed the probate of the purported will on the ground that the same was not written, dated and signed by the decedent, Mary Ann Craig, but by some other person. On the issues tendered by the intervention of Flores, who was named in the asserted testament as legatee of all of decedent’s property aside from her interest in the community, which was bequeathed to her husband, and the opposition of decedent’s sister and heir, this case was tried on the merits.
The only issue tendered on this appeal is purely factual in nature and relates to the validity, vel non, of the purported will. With respect to appeals involving questions which are exclusively factual, it is well established, on the basis of almost innumerable pronouncements, that appellate tribunals will accord great weight to findings of the trial judge which will not be disturbed except in cases of “manifest” error. Fully cognizant of this principle, we think it appropriate to turn our consideration to the assignments of error directed to the factual conclusions of the trial judge as evidenced by his written reasons.
With respect to the burden of proof, it is worthy of comment that the party tendering a will for probate bears the burden of establishing by a preponderance of evidence that the document was entirely written, dated and signed in the handwriting of the decedent; LSA-C.C. Art. 2245; C.P. Art. 325; Succession of Wadsworth, 152 La. 131, 54 So. 138; Succession of Lirette, La.App., 5 So.2d 197. The instrument here in question has been challenged as a forgery.
Generally, it is urged before this court that the trial court erred in finding that the intervenor had sustained the burden of proof, and specifically it is contended that the opinion of the trial judge was restricted to the use of certain standards of comparison attested only by intervenor and a friend of long standing and neglected numerous self-proving exhibits offered by the opponent; that certain specific documents were erroneously accepted by the trial court as having been written by the same person who wrote the questioned will; that sufficient weight was not accorded to the testimony of handwriting experts tendered by defendant, as well as the testimony of certain lay witnesses, and that proper weight was not given to the suspicious circumstances surrounding the discovery of the purported will.
Unfortunately for the length of this opinion, the complexity of the question of fact presented requires a somewhat detailed analysis of the testimony involving several hundred pages, as well as a consideration of scores of exhibits introduced by the parties.
Preliminary to the study of the hotly disputed issue as to the validity of the will, it is desirable to make a statement of certain undisputed facts which lay the foundation for consideration of the primary issue.
The intervenor, Richard L. Flores, came to Shreveport in the year 1948 and became an employee of the Plaza Cafe, operated by his brother, which establishment Mr. and Mrs. Craig were accustomed to frequent. It is evident that Flores became an intimate visitor in the Craig household and performed a number of services for the Craigs. Decedent was a victim of chronic alcoholism for a number of years prior to her death and early in the year 1959 suffered an accident in her home which resulted in fracture of a leg, for which she was hospitalized for several months; after returning home the pin with which the fracture had been affixed caused such pain and discomfort that she was returned to the ho.s- *594 pital for an operation in May, and her death occurred suddenly on June 13th.
The opponent in this proceeding, decedent’s sister, who resided in Memphis, was a not infrequent visitor to her sister’s home. Upon notification of her sister’s death, Mrs. Smith immediately came to Shreveport, where she remained for about a week, at which time her daughter-in-law, Mrs. Norman, came to Shreveport and remained with Mr. Craig until July 3rd, on which date the intervenor, Flores, moved into the Craig home, where he remained as a resident.
In addition to the nominal search of the decedent’s bank box conducted by counsel for Mr. Craig in the succession proceedings, the record discloses that an extensive search was made by the administrator, Mr. Grigsby, by Mrs. Smith and by Mrs. Norman. It is evident that the search for a possible existing will by Mr. Grigsby was systematically and methodically conducted. The testimony of Mrs. Norman is to the effect that she almost literally tore the place apart in the conduct of her search. The interest of Mrs. Norman lay in her self-confessed hope that the decedent had made some bequest which would benefit her children. A search had also been conducted by the colored maid, who was employed by Mrs. Craig and remained until sometime after her death, one Betty Jean Billiard. This individual left her employment in the Craig home when Mr. Flores took up his residence there and he employed for a brief period of time a white maid and then another colored woman by the name of Ruth Thomas, the person who found the purported will some two or three weeks after she had entered upon her employment. On the occasion of the discovery of the disputed instrument, Ruth Thomas testified that she was engaged in cleaning out a closet in what was called the third bedroom of the Craig home, which closet contained some clothing belonging, according to her testimony, to both Mr. Craig and Mr. Flores, boxes, an old radio and a metal box. The instrument, later discovered to be the alleged will, was “on the floor; with its face turned down and the edge of it was sticking down, you know, under it; looked like a little old radio box.”
Ruth Thomas could neither read nor write and she had been particularly instructed by Flores if she found any money or papers about the house she was to take them immediately to Mr. Craig. In accordance with these instructions she took the envelope to Mr. Craig and later in the morning it was delivered to Mr. Grigsby, who in turn transmitted it to counsel for Mr. Craig.
The suspicious circumstances in connection with the discovery of the “will” are so obvious as to hardly need elaboration. It is almost fictionally strange that repeated searches designed to discover the existence of a will, if any, made by intelligent people should have failed, and that by apparently pure coincidence an illiterate negro maid should find a document of importance in a location which had been already searched time and again. It is also somewhat unusual that Flores should have given such specific directions to a newly employed maid as to the disposition of any money or papers which she might find about the house. While suspicious circumstances in themselves should not be accepted as proof, it is, nonetheless, essential that they be given proper consideration in connection with other elements which might serve to cast light upon a disputed issue of fact.
Lay testimony as to the validity of the will was presented on behalf of intervenor by himself and by Mrs. Sarah Crosson and Mrs. W. H. Harrison. Mrs. Crosson, a waitress, apparently employed in the Plaza Cafe, testified that she had known the Craigs since sometime in the mid-forties; that she saw Mrs. Craig often while she lived in Broadmoor where the witness worked, and that she had often seen her write letters and cards in the restaurant, as well as certain recipes, which will be hereinafter more particularly discussed. Upon the basis of these experiences, Mrs. *595 Crosson testified that the will was written by the decedent, Mrs. Craig.
Mrs. Harrison had also known the Craigs for about the same period of time, some fifteen years, more or less; had visited in her home; had seen her write, and, on occasion, had written the body of checks which were signed by Mrs. Craig. Additionally, the witness testified that she sometimes had occasion to look up telephone numbers for Mrs. Craig and in this connection she identified a 1956 telephone book with a page of “numbers frequently called” listing a number of names and telephone numbers she believed to have been written by Mrs. Craig. On the basis of these experiences this witness testified that the will was written by decedent.
On behalf of the opponent, in addition to her own, the lay testimony consisted of that of her daughter and of the maid, Betty Jean Billiard, a high school graduate, all of whom testified the will was not written by the decedent.
In support of their opposed contentions, the intervenor offered the testimony of Mr. Gilbert J. Fortier of New Orleans, a qualified and expert examiner of questioned documents, while the opponent tendered testimony of Mr. Linton Godown of Memphis, Tennessee, and Mr. George J. Lacy of Houston, Texas, also expert and fully qualified examiners of questioned documents.
As above noted, a large number of documentary exhibits were introduced for the purpose of furnishing standards of comparison with respect to the handwriting of decedent, consisting of letters, postcards, names and numbers from a telephone directory, authentic acts and cancelled checks. Out of these Mr. Fortier selected six examples of writing as being “standards of comparison” and from them concluded that the purported will was written by the same hand. Remarkably, this conclusion is approved and concurred in by Mr. Godown and Mr. Lacy, who accept the same six evidences of writing and the will as having been written by the same hand. However, these latter named experts do not concede, but on the contrary deny, the conclusion that this handwriting was that of the decedent, Mary Ann Craig. This vital difference in expert interpretation rests upon the fact that Mr. Godown and Mr. Lacy examined and accepted a large number of other written instruments and signatures which they considered as being established to be in the handwriting of the decedent and which in their opinion, negated the validity of the asserted will.
We will undertake now consideration of the six documents relied upon by interven- or’s expert witness, Mr Fortier, as standards of comparison which he concluded to be in the same handwriting as that of the will. These instruments comprise (a) three recipes; (b) a page from a telephone directory containing a list of handwritten names and numbers; (c) a Christmas card; and (d) a letter dated October 27, 1957, directed “To Richard and Tom.”
Intervenor’s witness, Mrs Crosson, first testified on direct examination that the three recipes, designated (a) above, were entirely written and given to her by the decedent, but on cross-examination she denied any knowledge of one of the recipes and declared that she had never seen the same until it was handed to her during the course of her testimony on trial. According to this witness the two identified recipes were written by decedent while sitting in an automobile, but she could not fix the dates of these incidents. This witness further testified that these recipes corresponded with the handwriting of the contested will. It is pertinent to observe that although Mrs. Crosson was not a directly interested party, she was a long-time friend and associate, in connection with her employment, with the intervenor, Flores, and was still working as a waitress in the employ of a member of Flores’ family. It is also relevant to comment upon her testimony with respect to her familiarity with Mrs. Craig’s handwriting, which she testified resulted from observation of the latter while writing personal letters and postcards in the res *596 taurant where the witness was employed, and, further, in their habit of “passing the time of day” by writing their signatures while seated at a table in the restaurant.
The testimony as to the page from the telephone directory, identified above as (b), was given by the witness, Mrs. Harrison, but careful examination fails to disclose any positive evidence as to her observation that the names and numbers were actually written, in her presence, by the decedent. The witness’ testimony, therefore, rests upon her belief and not her certain knowledge. This witness further testified with respect to three checks signed by “Mrs. Tom Craig,” which, however, were not used as standards of comparison by intervenor’s expert witness. There is some question as to how Mrs. Harrison came into possession of these checks. She first testified that they were returned to her with her bank statements, which was obviously incorrect, since they were Mrs. Craig’s checks and would have been returned to her by the bank upon which drawn. In any event, we do not find that her testimony with respect to the checks adds anything of value, one way or the other, to the determination of the question under consideration.
The Christmas card, above referred to as (c), was identified by the intervenor himself as having been received from the decedent, but he fixed no date nor could he give any other definite information. Similarly, the letter of October 27, 1957, above denominated as (d), was identified only by the testimony of the intervenor who declared that it was written in his presence by the decedent and given into his keeping to be held until, and in the event of, the death of Mrs. Craig. We have examined the contents of this letter with considerable interest. It is first noticeable that although the salutation is directed “To Richard and Tom,” the entire letter concerns requests to decedent’s husband, Tom Craig, who is consistently identified in the communication by the second person pronoun “you”, while reference to Flores is always by use of his given name “Richard.” Why such a letter of personal import, concerned exclusively with requests that Mrs, Craig wished her husband to fulfill in the event of her prior death, required, in common sense, that it be addressed and delivered to Flores and not her husband, appears to us to be inexplicable. Additionally, we find in the letter uncomplimentary references to “that Memphis bunch” (obviously intended to identify Mrs. Craig’s sister and other relatives who lived in Memphis, Tennessee). These apparently gratuitously unfavorable reflections are completely inconsistent with other letters written by the decedent to her sister and brother-in-law in Memphis reasonably near the date of the purported will, all of which indicate the existence of an affectionate relationship between these parties. The record is completely barren of any evidence of friction between Mrs. Craig and the members of her family.
In addition to the above six, and only six, standards of comparison accepted and used as the basis of the opinion and conclusion given by intervenor’s expert witness, two postcards were introduced on the part of intervenor, one being postmarked at Victoria, Texas, on September 5, 1949, addressed to Mrs. W. H. Harrison and signed “Mary”, and the other postmarked at Raton, New Mexico, July 17, 1950, directed to Mr. Richard Flores, the intervenor, and signed “Mrs. Craig.” While the testimony of Mrs. Harrison and Flores establishes that they received these cards and that Mrs. Craig was in the places referred to at the time of mailing thereof, we think it significant that both of these exhibits were rejected by in-tervenor’s expert witness as standards of comparison. It is also important, in connection with opponent’s assignment of errors, to observe that the district judge was in evident error, as reflected by his written opinion, in considering these postcards as constituting impelling reasons for his conclusion. It is true that, subsequent to the filing of his opinion, the judge authorized the correction thereof by changing the verbiage of his opinion from an apparent reference to “all” documents to a “number *597 of” documents. However, the judge did not choose to re-examine or alter his specific references to the postcards and his obvious acceptance of these exhibits as being of vital importance.
Implicit in the testimony of Mr. Fortier, the expert witness for intervenor, is the fact that he selected the six exhibits herein-above described for the reason that they conformed to the handwriting in the contested will. He explained his rejection of the postcards on the ground that, while they contained some similarities, they also contained a number of dissimilarities and he would not testify that the writing completely conformed to that of the will. This witness further testified that while he had been tendered a number of other instruments of writing, consisting of checks and other •documents, he could not specifically identify them in connection with his examinations, and, in fact, did not have any definite recollection either as to his examinations thereof or his reasons for rejecting the instruments as standards of comparison. We also find in the record a communication from this witness directed to a member of the firm of attorneys in Memphis, Tennessee, who are of counsel for opponent, which consists of a report with reference to the •questioned holographic will of Mary Ann ■Craig. In this report the witness stated that he had examined as standards ten full pages of handwriting attributed to Mary Ann Craig which enabled him to reach the ■opinion that the said standards and the questioned will were not written, by the same person. In fairness to the witness, it must also be observed that he reserved the expression of a definite and positive opinion pending an examination of the original documents, since he had been furnished only photostatic copies, though he felt sure that such an examination would confirm his opinion.
Our careful examination of six large pages of blown up photographs of portions of the so-called accepted standards and the questioned will, which photographs were carefully explained by the witness in his testimony, serve only to implement the conclusion, already conceded by counsel for the opponent, that these selected standards were written by the same hand as that which wrote the will.
We reiterate that the above conclusion does not solve the problem, and leaves at issue the question as to whether the will was written by the decedent, Mary Ann Craig.
Adverting to a consideration of the evidence introduced on behalf of opponent, we find a large number of exhibits consisting of numerous letters and accompanying envelopes, greeting cards and envelopes, au-thenic acts signed by Mrs. Craig, bank signature cards, and a large number of cancelled checks drawn by Mrs. Craig and paid by her bank. While some of these exhibits were identified only by the testimony of the opponent, a number of them passed through the United States mail service and none of them disclose any suspicious circumstances in connection with their writing and receipt. Additionally, the large number of authentic documents, checks and other instruments introduced in evidence on behalf of the opponent do not depend for corroboration upon the testimony of interested individuals. They are connected with ordinary, regular and customary matters of business which stand in an entirely distinct category from that of personal communications. These numerous exhibits were made available to Messrs. Godown and Lacy, the expert witnesses for opponent. In our opinion, the extensively detailed testimony of these witnesses, accompanied by numerous charts, blown up photographic details, and the photographic films, far outweighs in value, weight, clarity and conviction the testimony of inter-venor’s expert.
We are particularly impressed with certain photographic exhibits introduced in connection with the testimony of Mr. Lacy which illustrate a comparison of the words, letters and figures of the questioned will with numerous identified writings of the *598 decedent. Even to an untrained observer, and without the additional benefit of Mr. Lacy’s detailed testimony, the distinctions are so obvious and irreconcilable, in practically every respect, that we cannot find basis for any disagreement with the conclusion of this witness that the purported will fails to conform to the individual idiosyncrasies of the decedent’s handwriting, as exemplified in a large number of identified standards.
After painstaking examination of the record before us, we are convinced that the purported will was not written by the decedent, Mary Ann Craig.
For the reasons assigned the judgment appealed from is annulled, set aside and reversed, and
It is now ordered, adjudged and decreed that the demands of the intervenor, Richard L. -Flores, that the said document be admitted to probate, registered and executed, be and they are hereby rejected at his cost.
It is further ordered, adjudged and decreed that the purported holographic will of Mary Ann Craig, dated July 28, 1958, be and the same is hereby declared to be null, void and of no effect.